[Cite as *State v. Welninski*, 2018-Ohio-778.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                        Court of Appeals No.   WD-16-039
                                                                           WD-16-040
        Appellee
                                                     Trial Court No.   15-CR-552
v.                                                                     16-CR-039

Jack Welninski                                       **DECISION AND JUDGMENT**

        Appellant                                    Decided:  March 2, 2018

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Thomas Matuszak
and David T. Harold, Assistant Prosecuting Attorneys, for appellee.

Mollie B. Hojnicki-Mathieson, for appellant.

* * * * *

**MAYLE, J.**

### Introduction

{¶ 1} In these consolidated appeals, appellant Jack Welninski, appeals a jury

verdict finding him guilty as to two, multiple count indictments.  The indictments

describe a course of events that occurred in the early morning hours of December 18,

2015, beginning at a bar in Lucas County, where Welninski pistol-whipped a patron on the head and then fired his gun, twice. A short time later, Welninski, his wife and his brother fled from the police into Wood County, where Welninski and his wife engaged in a gun battle with the police. In the end, Welninski was apprehended, and his wife Erica Lauro[1] committed suicide at the scene.

{¶ 2} Welninski was found guilty of all charges against him. Many of the charges carried with it a gun specification and/or a repeat violent offender specification. The Wood County Court of Common Pleas sentenced him to an aggregate term of 97 years in prison, 88 years of which are mandatory. Welninski appealed. As set forth below, we affirm the convictions but we find that the trial court erred when it failed to merge Welninski's attempted murder and felonious assault convictions in case No. 15-CR-552 because the two convictions are allied offenses of similar import under R.C. 2941.25. Accordingly, the judgment of the trial court is reversed, in part, and the matter is remanded for a limited resentencing in case No. 15-CR-552, where the state will elect which of these convictions to pursue for sentencing.

## Facts and Procedural History

{¶ 3} The following evidence was offered at trial: Welninski, Lauro, and Welninski's half-brother, Kenneth ("Kenny") Maldonado, were traveling from Chicago to New York on December 17, 2015. After a brief detour to Detroit, they stopped for the

---

[1] At times during this case, Lauro was also described as Welninski's "girlfriend." No evidence was offered to establish whether the two were married, but Welninski referred to Lauro as his "wife" throughout this case.

2.

night and rented a room at the Holiday Inn Express in Oregon, Ohio. Once inside the hotel, Welninski told his brother to go to a nearby restaurant and bring back some food. When Maldonado returned to report that the restaurant was closed, they decided to eat out. While Welninski showered, Maldonado looked through his brother's travel bag and saw two handguns: a silver one and a black one. While in the room, each consumed one alcoholic beverage.

{¶ 4} Around 10:30 p.m., the three left the hotel and walked to a restaurant next door, Icon's Bar and Grille, on Navarre Avenue in Oregon. Maldonado testified that he did not bring a weapon with him to the bar, and, at that time, he did not know if Welninski or Lauro had one either. While at Icon's, Maldonado said that each of them consumed "maybe two shots and a couple of beers." Video surveillance from the bar and testimonial evidence established that Welninski and Maldonado were both wearing grey hooded sweatshirts. Welninski had a number of tattoos that were visible that night. Maldonado had no visible tattoos and was wearing a baseball hat.

{¶ 5} Also at Icon's that evening were Ana Pecina, Jay Davis, and Brandon Vergara. The three went there together, around 12:40 a.m., now December 18, 2015, to meet a mutual friend. Within a few minutes of entering the bar, they found their friend. All but Pecina went to an outdoor patio where smoking was allowed. Pecina used the restroom, and then began looking for her friends. As Pecina walked throughout the bar looking for them, she was approached by a man, later identified as Welninski, near the entrance. Welninski asked for her name, and when she ignored him, he asked again. Pecina testified that a woman suddenly got "in [Pecina's] face" and told her "not to be

3.

talking to him" because "he has a wife," and the woman called Pecina a "bitch." Silent video footage captured part of that exchange, including: Pecina walking in front of the camera; Welninski speaking to somone (who was not within view of the camera); Lauro physically directing, almost pushing, Welninski out the door; and Welninski continuing to talk over his shoulder to someone. The video also shows Welninski with his hood pulled up over his head. At trial, the woman yelling at Pecina was identified as Erica Lauro, Welninski's wife.

{¶ 6} Pecina walked away, in search of her friends and called Jay Davis to ask where in the bar they were. When Davis answered the call, he could hear a woman, not Pecina, yelling, "[b]itch, I will beat your ass." Pecina found her friends outside, on the patio. The patio is enclosed by a fence that is chest high and has no separate entry, other than through the bar. Pecina reported that "some girl was trying to fight [me] because the dude had said 'hi' to [me] and [the girl] got mad." As Pecina was retelling the story, Lauro, Welninski, and Maldonado were exiting the bar and appeared on the other side of the patio fence. The argument between the women then resumed. Lauro was described as "going crazy" and "trying to fight" and "jumping up and down and yelling and screaming and cussing."

{¶ 7} The spat escalated to a physical altercation almost immediately, with Pecina's friends (Davis and Vergara) leaned up against one side of the fence, and the other two men (Welninski and Maldonado) outside of the fence. As described by Davis and Vergara, one of the men grabbed Vergara and tried to pull him over the fence. The other man, who was initially holding back Lauro, soon joined in and began punching

4.

Vergara. Vergara's view was obstructed by his tee-shirt that was pulled up over his head, but he insisted that he received blows to his torso from two different people. Davis, who was beside his friend Vergara, tried to free Vergara from the others' hold and punches.

{¶ 8} Vergara described feeling "something [hard] hit me on the top of my head." Davis testified that the person who was *not* wearing a baseball hat, i.e. Welninski, was the one who pulled out a gun and hit Vergara over the head with it. The gun came within six inches of Davis' face, and Davis found himself "holding * * * [the] hand [of the person] with the gun in it and he is aiming it at me [in an] up and down motion."

{¶ 9} With Davis' help, Vergara broke free. Once freed, Vergara grabbed a patio chair and threw it over the fence at Welninski and Maldonado. According to Vergara, the two men "stumble[d] back" and "two gunshots * * * were fired." Davis gave a similar account. He testified that the chair "[flew] over the gated area and hit [the shooter] in the face and chest area and he falls, stumbles back, and that is when two rounds are fired."

{¶ 10} At trial, during their direct examination by the state, Pecina, Vergara, and Davis independently identified Welninski as the person who was responsible for pistol-whipping Vergara and for firing two shots. Their respective testimony was challenged on cross-examination. For example, during her direct examination, Pecina testified that the person with the gun and the person who asked her name earlier were one and the same, and she identified Welninski as that person. Under cross-examination, Pecina acknowledged that she told the police that night that the person with the girl inside the bar was *not* the person who pistol whipped Vergara. Moreover, she repeated the latter

5.

version just days before trial, when she was interviewed by Welninski's investigator. And while Vergara and Davis testified that they told police that the guy with a gray hoodie and tattoos had pistol-whipped Vergara on the patio, on cross examination they both acknowledged that neither had told police that the assailant had tattoos.

{¶ 11} Maldonado also testified. He stated that he was testifying voluntarily, and not as part of any plea agreement with the state. Maldonado identified his brother as the one who pistol-whipped Vergara and who fired the gun. As he described the scene, Maldonado left the bar around 1:30 a.m., which was right after Welninski and Lauro had left. Once outside, he saw that his brother "had a guy by the shirt and he was like face-to-face with him saying something to him." Maldonado moved closer to Lauro, who was "in a run-in with this girl and I stopped [Lauro] and told her 'it isn't worth it.'" Maldonado watched his brother "let [the man] go" but when the man said something to Welninski, that is when Welninski "started hitting him - - pulled a gun out and started hitting him * * * on top of his head." Maldonado described the gun as the same silver gun that he had seen in the hotel room. Welninski hit the person two or three times. Once Maldonado realized what was happening, he "went to pull [his brother] back and the gun went off in the air when I pulled him back."

{¶ 12} After the gun went off, everyone scattered. Vergara, Davis, and Pecina ran inside, to the kitchen bar, where Davis called 911. After reporting Vergara's injury, Davis told the 911 operator that the assailant and two others ran inside the hotel next door. Vergara received treatment at St. Charles Hospital and was diagnosed with a concussion. A scar remains on Vergara's head, along with two indents in his scalp.

6.

{¶ 13} The incident at Icon's lasted a little over three minutes, from 1:06 a.m., when Pecina called Davis from within the bar, until 1:09 a.m., when Davis called 911.

{¶ 14} Maldonado felt "scared" when the gun went off and ran to the hotel ahead of Welninski and Lauro. Back in the room, Welninski started to pack and told Maldonado that they were leaving. When Maldonado said that he thought they should stay in the hotel, Welninski "hit [him] in the back of the head with a gun and said 'we are leaving.'" Welninski also instructed that Maldonado would drive. Maldonado testified, "[w]ell, he said we're leaving and said I was going to drive and I took it that I was going to drive."

{¶ 15} As planned, the three left. Maldonado drove an SUV[2] with Lauro in the front passenger seat and Welninski in the back. At the time, Maldonado did not have a gun on him. About a mile into the trip, they were pulled over by a police car with flashing lights. Maldonado turned to his brother, in the back seat, and said that he was not going to run from the police. Welninski pointed the silver gun at Maldonado and said that he was "not going back to prison, [and] to drive." Maldonado "floored the gas" for about a mile and a half, until they came into a residential neighborhood.

{¶ 16} Inside the SUV, he recalled Welninski handing Lauro the black handgun and the two of them saying "we are fucked." Maldonado backed into a driveway and turned the lights off. They watched as a police car drove by. Welninski told Maldonado

---

[2] The vehicle was described as a "Chevy Tahoe" and a "Tahoe Surburban." Maldonado testified that it was purple, while two officers described it as red or green. As neither the ownership, nor the details of the vehicle are at issue in this case, we refer to it simply as an "SUV" (sport utility vehicle).

7.

to go get a license plate from another vehicle. As Maldonado exited the SUV, Welninski handed him the silver gun "so the farmers don't shoot [me]." Maldonado crossed the street in pursuit of license plates and realized that, without a screw driver, he would not be able to remove plates from another car. He also heard, what he assumed was a person on a phone, talking to the police, describing Maldonado's location. Maldonado "froze" and then saw two officers running after him. Maldonado ran from front yard to back yard, over a fence and onto another street, where another police officer was waiting for him, about ten yards away, gun drawn and directing him to "get on the ground." Maldonado laid down flat and said, "Don't shoot me." He threw the gun he had been carrying on the ground.

{¶ 17} Six police officers testified at trial: Sergeant Kenneth Reno, Sergeant Jeff Martin, Officer Timothy Stecker, Officer John Kersker, Officer-in-Training Krystal Steller-Komenick, and Officer Joshua Hannum.

{¶ 18} The first officer to testify was Sergeant Kenneth Reno of the Oregon Police Department. Sergeant Reno was one of three officers to respond to a dispatch that shots had been fired at Icon's and that there was "a person down in the parking lot with a head wound." The dispatcher also reported that "two white males and a Hispanic female had fled south from Icon's towards the Holiday Inn." Sergeant Reno approached Icon's from the south, "in hopes of catching the suspects fleeing." When he didn't see anybody, he pulled into Icon's parking lot. The time was 1:13 a.m. Two patrol cars were already there.

8.

{¶ 19} From the parking lot, Sergeant Reno watched an SUV driving through the parking lot of the Holiday Inn Express without its lights on, at a high rate of speed, before pulling onto Dustin Road. Sergeant Reno observed "what looked to be two white males in the front seat," but he could not identify the driver. Sergeant Reno followed them in his car, which he reported over his radio. Oregon Police Sergeant Jeff Martin heard the call and provided back-up. At the time, Sergeant Martin was inside the lobby of the hotel, looking for the three who had fled Icons. Sergeant Martin had the department's police dog with him at the time.

{¶ 20} Sergeant Reno caught up to the SUV on Coy Road, notified dispatch that he would be stopping a vehicle, activated the patrol car's emergency lights, and watched the SUV pull to the side of the road. Although he had not been given a description of any vehicle to be looking for, he was suspicious of it because of the proximity in time between the dispatch and the time he saw it speeding through a parking lot with its lights off. Understanding that he had been dispatched on a "weapons call," Sergeant Reno ordered the driver out of the vehicle, rather than to approach it himself. When he did, the SUV sped off, to the south. Sergeant Reno communicated to his fellow officers that he was in pursuit of the SUV. An Oregon Police Patrolman, Officer Timothy Stecker, heard the call and headed to the area.

{¶ 21} Sergeant Reno estimated that the SUV accelerated to a speed of about 70 miles per hour in a 35 mile per hour speed zone. Sergeant Reno lost sight of the car when it ran a stop sign and crossed into Northwood, Ohio in Wood County. Sergeant Reno, Sergeant Martin, and Officer Stecker scoured the area for approximately 10 minutes from

9.

their respective squad cars. Also in the area were other officers in three patrol cars from the Northwood Police Department who were responding to a 911 call about a suspicious person in the neighborhood.

{¶ 22} From there, events transpired quickly. From their respective squad cars, Sergeant Reno, Sergeant Martin, and Officer Stecker witnessed Northwood Police Officer John Kersker and Officer-in-Training Krystal Steller-Kominek chasing "a white male suspect" (later determined to be Maldonado) on foot. Sergeant Martin described the person as wearing a white shirt with a dark object in his waistband, running toward him. Maldonado ran around Sergeant Martin's vehicle and continued running. Sergeant Martin got out of his vehicle and gave "multiple warnings" that if Mardonado "didn't stop" he would release the dog on him. Maldonado did not stop, and Martin released the dog, who bit Maldonado in the arm. Maldonado went to the ground and surrendered. Later, the silver handgun, identified as a .9 millimeter, would be found in the area near where Maldonado surrendered. While law enforcement officers were focused on Maldonado, the officers "heard a loud boom."

{¶ 23} Sergeant Reno described an "extremely loud gunshot" to the east. Reno looked and saw "another male suspect holding a sawed-off shotgun." Reno observed the gun recoil and smoke exit the barrel. He also noticed that the man, whom he identified in court as Welninski, was standing outside the driver-side door of the SUV. The car was backed into a driveway, facing the street.

{¶ 24} Officer Stecker described the incident similarly. That is, he also watched as Maldonado attempted to run on foot. To assist the Northwood police officers who

10.

were chasing him, Officer Stecker directed his spotlight on Maldonado. As he was adjusting the spotlight from within his patrolcar, he heard a "loud boom." Stecker testified, "[a]s I am adjusting [my spotlight], a loud explosion, a bright flash of light to my left. I * * * experience[d] the overpressure of a projectile passing behind my head and neck." Overpressure is the air being pushed out of the way by a projectile as it cuts through the air. The bullet traveled through the open driver-side window, behind Stecker's neck and head and penetrated his passenger-side door, exiting the door and shattering the window.

{¶ 25} Sergeant Martin, who was parked behind Officer Stecker's car, about 50 feet away from Welninski, testified that after the first gunshot, "multiple gunshots come from the other side of the vehicle," i.e. the passenger-side. Martin's dash-cam video indicates that the initial gunshot was immediately followed by two additional gunshots, also fired from the SUV.

{¶ 26} Suddenly, all attention turned to the SUV that was parked, backside in, in a driveway, with its lights off. Officer Stecker, who was the closest to the SUV at a distance of about 30 feet, fired two rounds from his handgun. As he returned fire, Officer Stecker noticed two figures retreat behind the SUV. Officer Stecker retrieved his patrol rifle from the trunk of his vehicle and "pointed it towards the shadows that were moving behind the car." Officer Stecker fired three rounds through the windshield of the SUV. Officer Stecker also ordered Maldonado, who had surrendered in the grass, to "crawl towards us * * * out of the field of fire * * * for his safety." On Officer Stecker's dash-

11.

cam video, Maldonado can be seen crawling through the grass towards the vehicle as instructed. Officer Stecker asked Officer-in-Training Sellers-Kominek to keep control of Maldonado.

{¶ 27} From his location about 75 feet away, Sergeant Reno observed the female (Lauro) on the passenger side of the SUV, holding a handgun. Sergeant Reno ordered her multiple times to drop the gun. When she did not, Sergeant Reno fired at her once. When his gun malfunctioned, Sergeant Reno replaced it with a rifle. He fired a second shot at Lauro. Lauro returned fire at Reno, and then fled to the rear of the vehicle.

{¶ 28} Sergeant Martin also fired one round from his issued handgun and observed Northwood Police Sergeant Genzman also return fire. Sergeant Martin ordered the dog to run to the back of the SUV, where it attacked Welninski and bit him on the arm.

{¶ 29} It was described as a chaotic scene, with a lot of talking amongst the officers and the suspects. Sergeant Reno recalled Welninski yelling that he had a "hostage," and Sergeant Reno yelled to his fellow-officers that there was no hostage and that both suspects were armed. At some point, Sergeant Reno became aware that the female "went to the pavement" but did not know the cause.

{¶ 30} Welninski surrendered by walking around the driver's side of the SUV and throwing his shotgun "out into the street which bounced off the front of [Officer Stecker's] patrol car's grill" and back onto the street. Officer Stecker's dash-cam captured the shotgun sliding along the pavement before it came to a rest. When taken into custody, Welninski screamed profanity at the officers, spat at them and said, "You killed my wife, you killed my wife." Police retrieved two unused shotgun shells from

12.

Welninski's pockets.  In all, 17 minutes elapsed between the time Sergeant Reno began following the SUV at 1:13 a.m. until Welninski's surrender at 1:29:31.

{¶ 31} Officer Kersker found Lauro behind the SUV, on the ground, bleeding from the head.  He checked for a pulse but could not find one.

{¶ 32} Welninski was taken to the hospital where a bullet was removed from his right calf.  He was also treated for a dog bite on his right forearm.  Blood tests revealed that Welninski's blood alcohol level was 0.111 percent.  He also tested positive for cocaine and marijuana.

{¶ 33} Patrolman Joshua Hannum reported to the hospital to transport Welninski to the Northwood Police Station.  While waiting, Officer Hannum observed Welninski on a gurney with a towel over his head.  Officer Hannum assumed Welninski was unconscious until Welninski announced that he wished he would have killed some cops and that "[t]he coward pussies killed a 22 year-old girl hiding behind a truck."  Officer Hannum took Welninski to the police station so that he could be fingerprinted and booked.  While in a temporary holding cell, Welninski made several unsolicited comments, including, "I ran up to that cop and popped one in his door."  Officer Hannum observed Welninski say words to that effect "multiple" times and did so with "a slight smile on his face."  Two audio video clips from the station were also played.  In one, Officer Hannum can be heard conducting an inventory.  When he asked Welninski how much money he had, Welninski replied, "What does my money have anything to do with it?  I shot at a cop."  The second clip was more difficult to hear, but clearly audible was Welninski's question to Officer Hannum in which he asked, "[h]ey, did that squad car

13.

even get hit? I didn't even shoot [inaudible]." Officer Hannum replied that he "had no idea what happened out there" because he was not at the crime scene. Welninski then added, "I ran up on that motherfucker [inaudible]. That's what happened." On the witness stand, Officer Hannum testified that Welninski said that he had run up on an officer and "dumped on him."

{¶ 34} The Ohio Bureau of Criminal Investigation ("BCI") is a branch of the Ohio Attorney General's Office that assists local law enforcement agencies conduct criminal investigations. BCI Agent David Horn arrived at the crime scene at approximately 3:30 a.m. to secure it and to gather evidence. In all, Agent Horn took hundreds of photographs, many of which he identified at trial.

{¶ 35} A series of pictures depict Lauro's dead body near the back, passenger side of the SUV. Blood stains run from her body toward the front of the car. Pictures of Lauro's head indicate a wound to her temple. Next to Lauro is a black weapon, identified as a "Hi-Point" CF-380 semi-automatic handgun. Agent Horn testified that the position of the slide on the gun indicates that a round was fired. Also, "red brown staining on the front of the gun" indicates that the gun was either "in close proximity to a wound" or that blood was transferred there by hand. Another picture shows a "spent" Winchester .380 shell casing nearby. Inside the open front passenger door is a live, unused shell casing and a purse.

{¶ 36} A "Harrington & Richardson" shotgun used by Welninski was also presented, as was an unused "Remington" 12-guage shell casing that was found behind

14.

the SUV and "wadding" from the shotgun slug, which was found near Officer Stecker's cruiser. The wadding separates the gunpowder from the slug. Agent Horn investigated the weapon and testified it had been fired.

{¶ 37} Kevin Belcik, also with the BCI, examined and tested the firearms in this case. According to Belcik, all three weapons (the black .380 semiautomatic that was recovered near Lauro's body, the silver Ruger .9-millimeter semiautomatic pistol, that Maldonado discarded as he ran from the police, and the Harrington & Richardon "sawed off" shotgun, that Welninski used) were all operable when recovered by police.

{¶ 38} Vickie Bartholomew is a fingerprint analyst with BCI. Bartholomew testified that none of the weapons had sufficient ridge details on them to allow a comparison of fingerprints. In other words, she could not identify who had handled the weapons, or eliminate anyone as having done so. She testified that "very often we don't see positive results for weapons. We often see either negative or insufficient findings."

{¶ 39} Special Agent Emahiser identified still shots created from video taken from Sergeant Reno's dash-cam. Sergeant Reno's car was parked behind Officer Stecker's vehicle, on the passenger side of the SUV. In three separate, grainy photos, Lauro can be seen dressed in white shoes and dark pants. In one, she is shown standing next to the passenger-side door of the SUV. A second shot shows Lauro and a flash of light, thought to be "the muzzle flash coming from the weapon she's firing." A third photo shows her moving toward the rear of the SUV. A similar dashcam photo was shown from Sergeant

15.

Martin's vehicle, which was parked on the other side of Officer Stecker's patrolcar, further down the street, facing the driver's side of the SUV. It depicts the muzzle flash from Welninski's shotgun blast at Stecker.

{¶ 40} The actual door of Officer Stecker's cruiser was presented to the jury, as were pictures showing a hole in the metal door and the remains of the shattered window. Part of a spent lead slug that was found in a yard, "in line" with the trajectory of the bullet was also presented. Also, after the evidence was transported to a secured garage, the police discovered a second area of damage to the patrol car, caused by a projectile that was found in the driver's door. An analysis of the spent bullet revealed that it was fired from the .380 handgun that was found near Lauro's body.

{¶ 41} Agent Emahiser met Welninski and Maldonado at the Northwood Police Station. Both told Agent Emahiser that they would be willing to talk to him. After they were transported to the Wood County jail, Welninski told him, "I don't know why those cops are saying I shot up those cars, I only shot once."

{¶ 42} Agent Emahiser read Maldonado his Miranda rights later in the day on December 18, 2015. Initially, Maldonado told several lies. For example, he said that "nothing really occurred" at Icon's and that no shots had been fired there. He also said that he had not handled a gun and that it been Welninski who drove away from the hotel and ignored Officer Reno's instruction to exit the vehicle. When Agent Emahiser met with Maldonado a few days later, Maldonado had a lawyer with him. At that time, he claimed that he had been the one to take a gun to Icons, and had pistol whipped a person there. During a third interview seven months later, on July 7, 2016, Maldonado said that

16.

it was his brother who had assaulted the patron at Icons. Maldonado testified that he initially lied because he had been threatened by his uncle, who told him not to say anything against Welninski or Maldonado would "wish [he] never did." Maldonado claimed that he also received a note in jail from Welninski directing Maldonado to accept a plea for the events that occurred in the bar, and that if he did not, Maldonado "would get beat up all of the time" in jail. Maldonado decided to tell the truth once prosecutors assured him that he would be "kept separate" while at the jail. Maldonado testified that Welninski blames him for Lauro's death-by-suicide and expected Maldonado to "take the hit for the charges stemming from the bar."

{¶ 43} Maldonado told the jury that his brother told him a "bunch" of times that he wanted to commit "suicide by cop," meaning that he would die in a gun fight with police. Maldonado recounted that Welninski and Lauro saw themselves as a modern day "Bonnie and Clyde," the fictional, outlaw couple from the 1960's movie of the same name in which the couple die during a gunfight with police.

{¶ 44} Audio clips from five different jail house phone calls were played for the jury. Before inmates use the prison phone system at the Wood County Jail, they are warned that their phone calls are being recorded. The state proffered Welninski as the speaker in each call, without objection. In the clips, Welninski can be heard stating the following:

1. December 18, 2015, to his brother, Bobby: "I didn't do nothing to nobody. I still got her blood all over my hands. * * * I am trying to take the charges for Kenny, too, because that was my gun."

17.

2. January 22, 2016, to his mother: "Kenny didn't do nothing. He literally had nothing to do with anything. He fucking ran at everything. He had nothing to do with anything."

3. April 18, 2016, to another brother, Kevin: "Cuz the kid didn't do nothing man. I forced him to drive and everything, right. * * * He didn't know I had a gun on me, but he knew I had a gun, you know what I am saying at the hotel. * * * I looked at the pictures. * * * I be looking at this shit thinking it's all my fault."

4. May 30, 2016, to brother Bobby: "That fool that I hit in the head at the bar. * * * I should have went there and snapped his mother-fucking neck."

5. June 27, 2016, to brother Bobby: "I said, '[t]he only reason that I came out and I gave up when everything happened was because I was trying to get her help.' * * * besides that, I would have had a standoff with them bitches for hours? You feel me? Fuck'em."

{¶ 45} Welninski was indicted in two separate cases. On January 6, 2016, in case No. 15-CR-552, Welninski was indicted on one count of attempted murder, in violation of R.C. 2923.02, a felony of the first degree. Attached to this charge were three specifications: a seven year firearm specification pursuant to R.C. 2941.1412(A); a repeat violent offender specification pursuant to R.C. 2941.149(A), and a specification for forfeiture pursuant to R.C. 2941.1417(A). Welninski was also charged with felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree. Attached to

18.

this charge were two specifications: a seven year firearm specification pursuant to R.C. 2941.1412(A); and a repeat violent offender specification pursuant to R.C. 2941.149(A). Welninski was arraigned on January 14, 2016, where he entered pleas of not guilty to all counts.

{¶ 46} On January 21, 2016, in Case No. 16-CR-039, Welninski was indicted on six separate counts: receiving stolen property, in violation of R.C. 2913.51(A), a felony of the fourth degree, carrying a concealed weapon, in violation of R.C. 2923.12(A)(2) and (F)(1), a felony of the fourth degree; illegal possession of a firearm in a liquor permit establishment, in violation of R.C. 2923.121(A) and (E), a felony of the third degree; felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree; having weapons under disability, in violation of 2923.13(A)(2), a felony of the third degree, and failure to comply, in violation of R.C. 2921.331(B), a felony of the fourth degree. Each count carried with it one or more firearm specifications, and the felonious assault charge carried with it a repeat violent offender specification. Welninski entered not guilty pleas during his January 22, 2016 arraignment.

{¶ 47} A three day jury trial began on July 5, 2016. At the start, the state dismissed the receiving stolen property charge. The jury found Welninski guilty as to all remaining charges.

{¶ 48} The court held a separate hearing regarding the repeat violent offender specifications. The court found that Welninski was convicted of the repeat violent offender specifications attached to Counts 1 and 2 in case No. 15-CR-552 and Count 4 in

19.

case No. 16-CR-039. The court sentenced Welninski to 97 years in prison, 88 years of which are mandatory. Welninski was appointed appellate counsel and raises six assignments of error for our review.

1. First Assignment of Error: The trial court abused its discretion when it sentenced appellant to all firearm specifications in Case Number 16-CR-039.

2. Second Assignment of Error: The offenses of attempted murder and felonious assault are allied offenses of similar import and subject to merger.

3. Third Assignment of Error: Appellant's convictions are against the manifest weight of the evidence.

4. Fourth Assignment of Error: The trial court erred when it prevented appellant from introducing into evidence the co-defendant's proffer, cooperation agreement, and plea of guilty and questioning witnesses regarding the same, and by commenting on appellant not testifying at trial.

5. Appellant was denied effective assistance of counsel as guaranteed by the United States and Ohio Constitutions.

6. The trial court erred when it imposed the costs of prosecution without consideration of appellant's present or future ability to pay.

{¶ 49} We will address the trial-related assignments of error first, followed by the sentencing-related assignments of error, in the following order: (1) the trial court's failure to allow certain evidence relating to Maldonado's plea bargain and the trial court's

20.

alleged violation of Welninski's Fifth Amendment right to remain silent (fourth assignment of error): (2) whether the convictions are against the manifest weight of the evidence (third assignment of error); (3) the alleged ineffective assistance of trial counsel (fifth assignment of error); (4) whether Welninski's convictions for attempted murder and felonious assault in case number 15-CR-552 are allied offenses of similar import and should merge (second assignment of error); (5) whether the trial court abused its discretion when it sentenced Welninski to all firearm specifications in case number 16-CR-039 (first assignment of error); and (6) whether the trial court erred by imposing costs of prosecution without a finding of Welninski's ability to pay (sixth assignment of error).

### 1. Impeachment of Maldonado; Welninski's Outburst

{¶ 50} In his fourth assignment of error, Welninski makes two separate arguments. He argues that the trial court erred when it prevented him from introducing into evidence Maldonado's cooperation agreement and plea bargain between Maldonado and the state. He also argues that the trial court violated his Fifth Amendment right to remain silent by commenting on his failure to testify. We consider each argument in turn.

{¶ 51} First, Welninski argues that he "attempted to impeach" Maldonado's credibility by questioning Agent Emahiser "regarding [Maldonado's] plea deal." Welninski claims that the trial court "denied * * * his right to elicit testimony from [Agent Emahiser] regarding these factors."

{¶ 52} By way of context, Maldonado, who testified before Emahiser, was also questioned, albeit briefly, about a plea bargain. During his testimony, the trial court instructed Welninski's lawyer not to question Maldonado about the length of any prison

21.

sentence Maldonado faced if convicted of the charges for which he was indicted. On appeal, Welninski does not challenge that instruction. Instead, his complaint stems from what occurred later that same day, during his counsel's cross examination of Agent Emahiser. While examining Agent Emahiser on the subject of Maldonado's inconsistent statements to the police, Welninski's counsel asked him, "[t]he deal was is that [Maldonado] was going to get nine years in prison, correct?" [sic] An extensive sidebar conversation ensued, out of earshot from the jury. At its conclusion, the trial court ruled that counsel could "talk about a statement that was made in anticipation of a [plea bargain], but when you talk about specific years A versus B, then you have gone across the line." The court then instructed the jury to disregard counsel's question.

{¶ 53} Criminal defendants are entitled to cross-examine witnesses as provided by Evid.R. 611(B), but the scope of cross-examination is a matter within the discretion of the trial court. *See State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). We review a trial court's decision to limit the scope of cross-examination under an abuse of discretion standard. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 54} Evidence of a plea agreement between a witness and the state of Ohio is admissible under Evid.R. 616(A), as a means of demonstrating bias. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶104, citing *State v. Brooks*, 75 Ohio St.3d 148, 152, 661 N.E.2d 1030 (1996). Evid.R. 616(A) provides, "Bias,

22.

prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." The fact that a witness pled guilty to lesser charges and to testify against the defendant is sufficient to demonstrate the witness' potential to misrepresent the facts. However, "*[a] comparison of the potential penalties under the plea agreement versus the original charges does not add to this demonstration.*" (Emphasis added.) *State v. Gresham*, 8th Dist. Cuyahoga No. 81250, 2003-Ohio-744, ¶ 9. Accordingly, a trial court does not err in prohibiting testimony regarding a witness' potential penalty. *State v. Reed*, 10th Dist. Franklin No. 09AP-84, 2009-Ohio-6900, ¶11. ("The trial court did not abuse its discretion by limiting trial counsel's attempt to further hammer home [witness'] motive by questioning her in greater detail about the possible penalties she faced, especially in light of the fact that appellant was charged with the same offenses.").

{¶ 55} Here, the trial court did not prohibit Welninski from eliciting testimony about the presence of a cooperation agreement or plea bargain, either from witnesses Maldonado or Emahiser. Rather, it prohibited and struck his counsel's specific question as to the number of years Maldonado faced in prison. The trial court's ruling on this matter was proper. *Accord State v. Price*, 9th Dist. Summit No. 28291, 2017-Ohio-4167, ¶ 4-9.

{¶ 56} Within the fourth assignment of error, Welninski also makes a separate argument: he complains that the trial court violated his Fifth Amendment right to remain silent, following an outburst by Welninski during his counsel's closing argument. We disagree.

23.

{¶ 57} During closing arguments, Welninski interrupted his lawyer, Scott Coon, and blurted out, "Hey, Mr. Coon? I apologize, but I am tired. I did all that shit, find me guilty on everything. I am saying - -." The court responded, "Excuse me, this isn't your closing argument, sir. It is not the time. You didn't take the stand and testify, but now you have to be quiet. You have to be quiet."

{¶ 58} We find no merit to Welninski's argument that the trial court erred in its directive. Instead, we view the court's statement that "[y]ou didn't take the stand and testify, but now you have to be quiet" as an explanation that Welninski had an opportunity to testify, that he chose not to testify, and he could not testify now. We do not think that the court's statement can be construed as an invitation to the jury to draw an adverse conclusion from his decision not to testify. In fact, the trial court properly instructed the jury that Welninski "has a constitutional right not to testify. The fact that the defendant did not testify must not be considered for any purpose." We see no violation of Welninski's Fifth Amendment right to remain silent.

{¶ 59} Welninski's fourth assignment of error is not well-taken.

## 2. The Manifest Weight of the Evidence

{¶ 60} In his third assignment of error, Welninski argues that his convictions in case No. 16-CR-039, stemming from the incident at the bar, were against the manifest weight of the evidence. The central issue in this case was whether Welninski brought a weapon to Icons, used it to pistol-whip Vergara, and then fired it twice. Welninski alleged that it was Maldonado, not him, who committed these offenses. Vergara, Pecina,

24.

Davis, and Maldonado testified that it was Welninski. The jury chose to believe the testimony of these four eyewitnesses rather than Welninski.

{¶ 61} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. "'[I]t is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Miller*, 6th Dist. Lucas No. L-08-1056, 2009-Ohio-2293, ¶ 21, quoting *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10.

{¶ 62} Welninski argues that the jury should not have believed Vergara, Pecina, and Davis because, according to Welninski, they "all testified similarly, specifically in their inconsistencies with respect to the identification of the individual who produced the weapon, hit Mr. Vergara on head [sic], and discharged the weapon at the bar."

{¶ 63} During their direct examination, all three witnesses identified Welninski as the person who was responsible for pistol whipping Vergara and for firing two shots at the bar. Although neither Vergara nor Davis initially told police that the assailant had

25.

tattoos, at trial they both testified that the assailant had visible tattoos. And Pecina admitted on the witness stand that she had made out-of-court statements, including to the police, that the person who asked for her name inside the bar (i.e. Welninski) was *not* the person who pistol whipped Vergara, while at trial she testified that they were the same person.

{¶ 64} Welninski also challenges the credibility of Maldonado. He says that Maldonado's testimony was "self-serving and not credible" because he "greatly contradicted" himself in the multiple statements he gave to police. Maldonado explained the discrepancies by stating that he had been threatened by both his uncle and Welninski, and he decided to tell the truth after prosecutors assured him that he would be "kept separate" while in jail.

{¶ 65} A conviction is not against the manifest weight of the evidence solely based upon inconsistent or contradictory testimony. *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence."). The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54. Moreover, even though some discrepancies do exist, "'eyewitness identification testimony alone is sufficient to

26.

support a conviction so long as a reasonable juror could find the eyewitness testimony to be credible.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12, quoting *Johnson* at ¶ 52; *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14. "'The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury.'" *State v. Roper*, 9th Dist. Summit No. 20836, 2002-Ohio-7321, ¶ 55, quoting *Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

{¶ 66} We cannot say that the jury lost its way in believing Vergara, Pecina, Davis, and Maldonado despite the slight inconsistencies in their testimony. Indeed, the jury also heard Welninski's own confession to the crime ("That fool that I hit in the head at the bar. * * * I should have went there and snapped his mother-fucking neck"), which is certainly consistent with the eyewitnesses who testified that it was Welninski who pistol-whipped Vergara and then discharged his firearm.

{¶ 67} Accordingly, we find that Welninski's third assignment of error is not well-taken.

### 3. Ineffective Assistance of Trial Counsel

{¶ 68} In Welninski's fifth assignment of error, he claims that he was denied effective assistance of counsel at trial. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove a claim of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance was

27.

deficient and (2) the deficient performance prejudiced the defense. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs one and two of the syllabus, citing *Strickland* at 688.

{¶ 69} A reviewing court must determine whether trial counsel's assistance fell below an objective standard of reasonable advocacy. *Bradley* at 141-142. Moreover, the deficient performance must have been so serious that, "were it not for counsel's errors, the result of the trial would have been different." *Id.* at 141-142.

{¶ 70} Welninski cites three instances of ineffective assistance of counsel. He claims that trial counsel was ineffective because (1) counsel did not request a psychological examination of Welninski; (2) counsel did not seek a curative instruction after Welninski's outburst during his counsel's closing argument; and (3) counsel did not object to testimony by Agent Emahiser regarding Maldonado's credibility.

{¶ 71} First, Weninski argues that that, "[g]iven the extreme nature of the alleged charges and potential penalties," his counsel should have requested a psychological examination for purposes of determining his criminal responsibility and competency to stand trial. Welninski claims that it would have been appropriate for counsel to request a psychological examination because Welninski participated in high-speed chase, shot at a police officer, and participated in conduct that lead to the death of his "girlfriend." We find no merit to Welninski's argument.

{¶ 72} Welninski's attempt to avoid capture through a high-speed chase with law enforcement indicates an understanding of wrongfulness which, as a matter of law, does not support a not guilty by reason of insanity ("NGRI") defense. *State v. Myers*, 10th

28.

Dist. Franklin No. 09AP-926, 2010-Ohio-4602, ¶ 17, citing *State v. Saleh*, 10th Dist. Franklin No. 07AP-431, 2009-Ohio-1542, ¶ 86 (Engaging in furtive conduct is reflective of a consciousness of guilt.). In addition, Welninski's expressions of remorse ("I still got her blood all over my hands" and "[T]his shit [is] all my fault") demonstrate his understanding of right from wrong, the antithesis to a NGRI defense. Counsel's "[f]ailure to pursue * * * a defense strategy is only deficient performance when the facts and circumstances show that a plea of not guilty by reason of insanity would have had a reasonable probability of success." *State v. Hawkins*, 8th Dist. Cuyahoga No. 102185. 2015-Ohio-3140, ¶ 8. Here, because there is no indication in the record that a NGRI defense would have been successful or that there was any reason to believe that Welninski was not competent to stand trial, counsel did not err by not requesting a psychological examination.

{¶ 73} Next, Welninski claims that his counsel was ineffective for failing to seek a curative instruction after his outburst during closing arguments ("Hey Mr. Coon? I apologize, but I am tired. I did all of this shit, find me guilty of everything."). Counsel's decision-making as to whether to seek a curative instruction falls within the ambit of trial strategy, which "must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115. When challenging counsel's trial strategy through an ineffective-assistance claim on appeal, "the appellant must overcome the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * *

29.

*.'" *State v. Lawson,* 64 Ohio St.3d 336, 341, 595 N.E.2d 902 (1992) quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146.

{¶ 74} Welninski does not overcome the "strong presumption" that his attorney's decision not to seek a curative instruction was reasonable. Welninski does not articulate what the curative instruction should have been, or how such an instruction would have cured the impact of his outburst. We also agree with the state that such a request may have only served to draw further attention to Welninski's comment, thereby doing more harm than good. Moreover, even if we assume that Welninski's counsel erred by failing to seek a curative instruction, Welninski invited that error, and any resulting prejudice, himself. "Under the invited-error doctrine, a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Bitter v. Missig,* 72 Ohio St.3d 249, 254, 648 N.E.2d 1355 (1955). The invited error doctrine precludes Welninski from taking advantage of any prejudice that resulted from his own "outbursts and interruptions." *State v. Gonzalez,* 4th Dist. Athens No. 97CA52, 1998 Ohio App. LEXIS 5510 (Nov. 18, 1998).

{¶ 75} Finally, Welninski argues that his counsel was ineffective for failing to object to testimony from Agent Emahiser regarding Maldonado's credibility, because "the opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Pruett,* 8th Dist. Cuyahoga No. 101471, 2015-Ohio-1377. He claims that the testimony was particularly damaging in this case because it was offered by a law

30.

enforcement officer who is more likely to be perceived by a jury as an expert on the subject of whether a person is being truthful.

{¶ 76} Welninski complains about a single line of testimony, italicized below, which Agent Emahiser provided during cross-examination by Welninski's attorney:

Q: But, you believed what [Maldonado] was telling you, otherwise, you wouldn't have played any part in bringing him in to perger testimony would you?

A: I would say it is my opinion that he wasn't being completely consistent.

Q: But, yet you were going to call him as a witness in this trial?

A: *Because that is his testimony, that is what he is saying is truthful.*

\* \* \*

Q: So, apparently, there are parts of his story that the prosecutor didn't like, was that your impression?

A: There were parts of his story that we didn't believe were truthful.

{¶ 77} We disagree with Welninski that Agent Emahiser testified that Maldonado was being truthful. Rather he simply stated that Maldonado's testimony "is what he"—meaning *Maldonado*—"is saying is truthful." Regardless, as discussed, Welninski's conviction for the felonious assault at Icon's bar was based upon a significant amount of evidence beyond Maldonado's testimony, including the testimony of three other eyewitnesses and Welninski's own jailhouse confession. In light of the

31.

other evidence, Welninski cannot show a reasonable probability that, but for the admission of Agent Emahiser's allegedly improper statement, he would not have been convicted of the crimes that occurred at Icon's bar.

{¶ 78} Welninski's fifth assignment of error is not well-taken.

### 4. Allied Offenses of Similar Import

{¶ 79} In his second assignment of error, Welninski argues that his attempted murder and felonious assault convictions in case Number 15-CR-552, stemming from the shoot-out with police, are allied offenses of similar import and the two convictions should have merged at the sentencing phase under R.C. 2941.25. For the reasons that follow, we agree.

{¶ 80} The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the state through the Fourteenth Amendment, "protects against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). R.C. 2941.25 codifies the Double Jeopardy Clause's third protection, which prohibits multiple punishments for the same offense. The statute prohibits multiple convictions for "allied offenses of similar import" arising out of the same conduct. R.C. 2941.25 states:

32.

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 81} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff* at ¶ 26. This means that the "analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct—an inherently subjective determination." *Id.* at ¶ 32.

{¶ 82} In *Ruff,* the Supreme Court of Ohio announced that whenever a court considers whether there are allied offenses that merge into a single conviction, the court "must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Id.* at ¶25. When considering this overarching question, the court must address three sub-questions: (1) Were the offenses "dissimilar in import," meaning did the offenses involve either separate victims or "separate and identifiable" harm? (2) Were the offenses committed separately? and (3) Were the offenses committed with

separate animus? *Id.* at ¶ 23-25. "An affirmative answer to *any* of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." (Emphasis added.) *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12. The defendant bears the burden to establish that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶18, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).

{¶ 83} We review de novo a trial court's ruling as to whether convictions merge under the allied-offenses doctrine. *State v. Corker*, 10th Dist. Franklin No. 13AP-264, 2013-Ohio-5446, ¶ 28, citing *State v. Roush*, 10th Dist. Franklin No. 12AP-201, 2013-Ohio-3162, ¶ 47.

{¶ 84} Here, Welninski was convicted of attempted murder, in violation of R.C. 2923.02(A) ("No person shall purposefully cause the death of another") and felonious assault "by means of a deadly weapon * * * to wit: High Point Model CF .380 cal handgun" in violation of R.C. 2903.11(A)(2). ("No person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon"). As stated in the indictment, the sole victim of both crimes was Officer Stecker.

{¶ 85} Various eye-witness testimony combined with police dash-cam video establishes that the two offenses occurred in the following manner: shortly after Maldonado surrendered to police, three shots were fired from the parked SUV at Officer Stecker, who was sitting in his parked patrol car. The shots were fired by Welninski and Lauro as they were standing on either side of the SUV. Welninski used a Harrison & Richardson 12 gauge shotgun, and Lauro used a High Point Model CF .380 caliber

34.

handgun. The state argued, and proved, that when Welninski and Lauro shot at Officer Stecker with their respective weapons, they were acting in concert to grievously injure—and hopefully kill—Officer Stecker. Welninski was convicted of attempted murder for firing his own shotgun at Officer Stecker, and he was convicted of felonious assault for acting as Lauro's accomplice when she fired her .380 caliber handgun at Officer Stecker.

{¶ 86} The state argues that these two convictions cannot merge because the felonious assault conviction was based on aiding and abetting charges—which, according to the state, means separate conduct and separate animus. The state claims that because complicity between Welninski and Lauro was argued, proven, and instructed upon, Welninski could be convicted and sentenced for both attempted murder and felonious assault because "two separate shots from the two separate weapons wielded by two separate shooters created separate animi."

{¶ 87} The state's argument, however, is inherently illogical given that Welninski's complicity conviction under R.C. 2923.03 required the state to prove that Welninski and Lauro shared the same animus. *State v. Johnson*, 93 Ohio St.3d 240, 734 N.E. 2d 796 (2001), syllabus ("To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised or incited the principal in the commission of the crime, and that the defendant *shared the criminal intent of the principal*.") (Emphasis added). Moreover, because Welninski was convicted as an accomplice to Lauro's felonious assault of Officer Stecker, the law imputes the elements

35.

of that offense to Welninski and treats him as though he had pulled the trigger himself. *See State v. Thompson,* 10th Dist. Franklin No. 10AP-593, 2011-Ohio-6725 ¶ 1 ("[T]he law will impute the elements of the offense committed by the principal actor to the accomplice as an aider and abettor, as if the accomplice had committed those acts."); *State v. Jackson,* 90 Ohio App.3d 702, 705, 630 N.E.2d 414 (6th Dist.1993) (The law will treat an accomplice as though the accomplice had committed every act of the underlying principal offense.).

{¶ 88} Thus, contrary to the state's argument, Welninski's felonious assault conviction was not necessarily "committed separately" or "with a separate animus" under the *Ruff* test just because that conviction was based on complicity charges. Rather, because Lauro's conduct and intent are both imputed to Welninski as a matter of law, we must analyze the joint conduct of Welninski and Lauro—who were acting in concert to grievously injure or kill Officer Stecker—to determine whether, under the facts of this case, the two offenses of attempted murder and felonious assault were of dissimilar import, committed separately, or committed with separate animus.

{¶ 89} In considering the first prong of the *Ruff* analysis, i.e. whether the convictions were of dissimilar import, we must determine whether the two offenses involved separate victims or "separate and identifiable" harm. *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 23. Both parties agree that the two offenses do not involve multiple victims; the only victim was Officer Stecker.[3] In addition, given that all

---

[3] At a certain point during the gunfight, Lauro turned her gun and shot at Sergeant Reno. The felonious assault charge against Welninski, however, is not based on Lauro's

36.

of the fired bullets missed Officer Stecker, the resulting harm was identical. There is no way to identify any separate harm that resulted from each missed shot.[4] *See State v. Anthony*, 8th Dist. Cuyahoga No. 101847, 2015-Ohio-2267 (Concluding that the offenses of involuntary manslaughter and felonious assault were of similar import because the defendant killed the victim by stabbing him four times and there was nothing in the record to distinguish between the fatal and non-fatal stab wounds.) We therefore find that the two offenses were not of dissimilar import.

{¶ 90} Next, we consider the second and third prongs of the *Ruff* analysis—whether the offenses were committed separately or with a separate

_____

separate assault against Reno. The indictment against Welninski lists Officer Stecker as the sole victim of the felonious assault charge.

[4] In this regard, the instant case is distinguishable from *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, which, in any event, was decided under the now-overruled standard of *State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, ¶ 3 that previously required courts "to compare the elements of offenses in the abstract without considering the evidence in the case" to determine whether offenses are allied offenses of similar import. In *Williams*, the defendant fired two shots, one bullet missed the victim and the other paralyzed him. The state charged the defendant with two counts of felonious assault under R.C. 2903.11(A)(1) and (A)(2), and two counts of attempted murder under R.C. 2903.02(A) and (B) and the attempt statute R.C. 2923.02. After comparing the elements of the crimes, the court concluded that the two counts relating to the bullet that paralyzed the victim were allied offenses based on a comparison of R.C. 2903.11(A)(1) and R.C. 2903.02(B), and the two counts relating to the missed bullet were allied offenses based on a comparison of R.C. 2903.11(A)(2) and R.C. 2903.02(A). *Id.* ¶ 23-27. The *Williams* court did not consider the defendant's conduct or otherwise rely upon any facts in the record other than the fact that one bullet injured the victim and one bullet missed. Although we believe that *Williams* is no longer good law in light of *Ruff*'s subsequent pronouncement that courts "must first take into account the conduct of the defendant," *Ruff* at ¶ 25, we mention the case because we recognize that it may be possible to distinguish "separate and identifiable" harm in a case, unlike this one, where two bullets are fired but only one physically injures the victim. In contrast, all of the fired bullets missed Officer Stecker and, therefore, there is no "separate and identifiable harm" in this case.

37.

animus—together.  In *State v. Woods*, 6th Dist. Lucas Co. L-13-1181, 2014-Ohio-3960, we recognized:

> Separate conduct or separate animus may occur when a court determines the 'defendant at some point broke 'a temporal continuum started by his initial act.''* * * Alternatively, a separate conduct or animus may exist when 'facts appear in the record that 'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.  (Internal citations omitted)  *Id.* at ¶35 quoting *State v. Nuh*, 10th Dist. Franklin No. 10AP-31, 2010-4740, ¶ 16.

{¶ 91} Here, we cannot say that Welninski broke a "temporal continuum" or that any facts allow us to "distinguish the circumstances or draw a line of distinction" between the felonious assault and attempted murder of Officer Stecker.  The evidence establishes that Welninski fired one shot at Officer Stecker from his position at the driver-side door of the SUV, and then Lauro fired two shots at Officer Stecker from her position at the passenger-side door of the SUV.  The police dash-cam video demonstrates that these three shots, although fired from two different guns,[5] were fired in rapid succession, from the same location, and at the same target.  Some Ohio courts have recognized that "a perpetrator's discharge of gunshots in rapid succession either

---

[5] As we discussed earlier, because Welninski was convicted for his complicity in Lauro's felonious assault of Officer Stecker, it was established that Welninski and Lauro shared the same criminal intent and the law treats Welninski as if he actually fired the two additional, quick-fire shots from the High Point Model CF .380 caliber handgun.

38.

constitutes a single continuous act or is evidence of a single animus to harm the victim* * *." *State v. Jackson*, 1st Dist. Hamilton No. C-090414, 2010-Ohio-4312, ¶ 25; *State v. Norris*, 8th Dist. Cuyahoga No. 102104, 2015-Ohio-2857 ¶ 21 (finding merger was not appropriate because that case "d[id] not involve the quick firing of all of the gunshots at the same location in an unbroken succession").

{¶ 92} For example, in *State v. Gandy*, 1st Dist C-070152, 2010-Ohio-2873, the defendant approached the victim on the street, told him to "strip" and before he could respond, the defendant shot the victim three times. Witnesses confirmed that "the shooting had happened quickly." *Id.* at ¶ 10. The defendant was convicted and sentenced separately for attempted murder and two felonious-assault offenses. The court of appeals found that the trial court erred in sentencing the defendant for three separate offenses. It held that "because the shooting involved [the defendant's] discharge of three bullets into a single victim in rapid succession, the offenses cannot be said to have been committed separately or with a separate animus as to each." *Id.* at ¶ 11.

{¶ 93} Cases involving the analogous scenario of multiple stab wounds are also instructive. In *State v. Anthony*, 8th Dist. Cuyahoga No. 101847, 2015-Ohio-2267, the defendant stabbed the victim four times in the back, and the victim died. The defendant was convicted of involuntary manslaughter and felonious assault, and the court of appeals found that the trial court erred in failing to merge the two convictions. The appellate court first found that there was no "separate and identifiable harm" because there were no facts in the record to distinguish between the fatal and non-fatal stab wounds. *Id.* at ¶ 49. The court then turned to the next prong of the analysis under R.C. 2941.25, and noted that

39.

"just because there were multiple stabbings does not make it separate and distinct for purposes of our analysis." *Id.* at ¶ 51. The court ultimately concluded that there were no facts to establish "a break in a 'temporal continuum' between the initial stabbing and the final stabbing such that we could find that there were separate acts or separate animus," nor were there any facts in the record to "'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed.'" *Id.* at ¶ 50 quoting *State v. Roberts,* 180 Ohio App.3d 666, 2009-Ohio-298, 906 N.E.2d 1177, ¶14 (3d Dist.).

{¶ 94} Similarly, in *State v. Craig*, 4th Dist. Athens No. 15CA22, 2017-Ohio-4342, ¶ 26, the defendant stabbed the victim three times in rapid succession, and the court found that the defendant's convictions for attempted murder and felonious assault should merge because "there are no details to establish that there was a break in the continuum of events between the initial stabbing and the final stabbing."

{¶ 95} In contrast to these cases, merger is not warranted where—unlike here—the facts establish a clear break in the temporal continuum. For example, in *State v. Norris,* 8th Dist. Cuyahoga No. 102104, 2015-Ohio-2857, the issue was whether the defendant's convictions for murder and felonious assault should merge as allied offenses of similar import. The facts in that case established that the defendant first fired his gun at the victim in the street, but the gun was jammed and did not go off. The victim ran while the defendant cleared the jam from the gun. The defendant then chased the victim through the neighborhood, shot at him a second time, and killed him. The court found merger was inappropriate because that case "d[id] not involve the quick firing of all of the

40.

gunshots at the same location in an unbroken succession." *Id.* at ¶ 21. Rather, there was "a break in which [the defendant] cleared the jam from the gun [and] then pursued [the victim] to a new location and fatally shot him there." *Id.* at ¶ 21.

{¶ 96} Similarly, in *State v. Jackson*, 1st Dist. Hamilton No. C-090414, 2010-Ohio-4312, ¶ 27, the defendant shot the victim once during a fistfight, fled the scene, and then returned to fire one, fatal shot "to finish [him] off." The court concluded that the defendant's conduct supported separate convictions for murder and felonious assault, stating that "we are persuaded that the evidence supports the conclusion that he had knowingly caused serious physical harm to [the victim] with the first shot but that he had a more malevolent goal for the second shot." *Id.*

{¶ 97} And in *State v. Hayes*, 9th Dist. Summit No. 26388, 2013-Ohio-2429, the court found that the defendant's three separate gunshots supported three separate felonious assault convictions, and the trial court did not err in sentencing the defendant on all three counts, because the defendant "fired in three distinct directions, one of which covered the back entrance, one of which covered the front, and one of which could have covered either, depending on how far a person had walked." *Id.* at ¶ 35. The court found this demonstrated separate animus for each shot, and distinguished that case from those that involve "[t]he discharge of multiple gunshots in quick succession." *Id.* at ¶ 33. The court observed that the defendant did not "simply discharge [the gun] three times in the same direction." *Id.* at ¶ 35.

{¶ 98} Turning back to this case, we find that unlike *Norris, Jackson,* and *Hayes,* we cannot say that Welninski broke a temporal continuum after his initial shot at Officer 41.

Stecker, nor do we find any facts in the record that "distinguish the circumstances or draw a line of distinction" that is sufficient to identify separate conduct or any separate animus that would support a conviction for attempted murder as opposed to felonious assault, or vice versa. Rather, we find this case more analogous to *Gandy*, *Anthony*, and *Craig* because this case involves the rapid discharge of three bullets, all fired from the same location of the parked SUV, and all fired at the same victim: Officer Stecker. And given that all of the bullets missed their intended victim, there is no way to differentiate them. Moreover, when Welninski and Lauro fired these three, quick-fire shots from the same location and in the same direction at Officer Stecker, it is undisputed that they were acting with a single animus. As the state itself recognizes, "[they] were acting in concert to grievously injury[sic]—and hopefully kill—Patrolman Timothy Stecker." Finally, the police dash-cam video confirms that the two guns[6] were fired in rapid succession. There was simply no break in the sequence of events to support a finding that any of the three shots were fired with separate conduct or with a separate animus to kill, versus seriously injure, Officer Stecker.

{¶ 99} Accordingly, we find that Welninski's separate convictions of attempted murder and felonious assault are allied offenses of similar import and should have been

---

[6] Again, under the circumstances of this case, the fact that the shots were fired from two guns held by two different people is immaterial. Because Welninski was convicted for his complicity in Lauro's felonious assault of Officer Stecker, it was established that Welninski and Lauro shared the same criminal intent, and the law treats Welninski as if he actually fired both guns at Officer Stecker.

42.

merged under R.C. 2941.25. Welninski's second assignment of error is well-taken, and the judgment of the trial court is reversed and remanded for a limited resentencing where the state will elect which conviction to pursue for sentencing.

### 5. Firearm Specifications

{¶ 100} Welninski's first assignment of error challenges the trial court's decision to impose consecutive sentences as to each and every firearm specification for which he was convicted in case number 16-CR-039. That case involved the events that occurred at Icon's and the traffic stop thereafter.[7] Welninski was convicted of five felonies in that case: carrying a concealed weapon, illegal possession of a firearm in a liquor permit premises, felonious assault, having weapons while under disability, and failure to comply with an order or signal of a police officer. As to each of those five felonies, Welninski was convicted of a 1 year firearm specification, pursuant to R.C. 2941.141(A) ("[T]he offender had a firearm on or about the offender's person or under the offender's control while committing the offense.") As to three of those felonies (illegal possession of a firearm, felonious assault, and having weapons while under disability), Welninski was convicted of a 3 year firearm specification pursuant to R.C. 2941.145(A) ("[T]he offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated

---

[7] Welninski does not challenge the gun specifications or the repeat violent offender specifications attached to his attempted murder and felonious assault convictions in case No. 15-CR-552, nor does he challenge the repeat violent offender specification attached to his felonious assault conviction in case No. 16-CR-039.

43.

that the offender possessed the firearm, or used it to facilitate the offense.").  The trial court ordered that all of the specifications be served consecutively to any other prison terms imposed.

{¶ 101} A specification is a sentencing enhancement, not a separate criminal offense.  *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 16. According to R.C. 2929.14(B)(1)(b), a trial court is ordinarily prohibited from imposing more than one prison term for multiple firearm specifications associated with felonies that were committed as part of the same act or transaction *unless* R.C. 2929.14(B)(1)(g) applies.  R.C. 2929.14(B)(1)(g) serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction.  It provides:

> If an offender is convicted of * * * two or more felonies, if one or more of those felonies are * * * felonious assault, * * * and if the offender is convicted of * * * a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, *the sentencing court shall impose* on the offender the prison term specified under division (B)(1)(a) of this section *for each of the two most serious specifications of which the offender is convicted* * * * and, in its discretion, also *may impose* on the offender the prison term specified under that division for any or all of the remaining specifications. (Emphasis added.)

{¶ 102} Because Welninski was found guilty of two or more felonies, including felonious assault, and the felony counts contained firearm specifications, the trial court

44.

was mandated by R.C. 2929.14(B)(1)(g) to impose sentences "for each of the two most serious specifications of which [Welninski] was convicted," i.e. two of the three 3-year firearm specifications, consecutively. *See e.g. State v. Gervin*, 3d Dist. Marion No. 9-15-52, 2016-Ohio-8399, ¶ 199 ("All of his convictions were felonies and one of them was of the type enumerated in R.C. 2929.14(B)(1)(g). Therefore, the trial court was required to impose two separate three-year prison terms for the firearm specifications and those terms must be consecutive to the prison terms imposed for the underlying offenses.") In addition to the mandatory, consecutive sentences, the trial court had discretion to impose, and did in fact impose, consecutive sentences on the single remaining 3-year firearm specification and five consecutive sentences on the 1-year firearm specifications. *See State v. James*, 8th Dist. Cuyahoga No. 102604, 2015-Ohio-4987, ¶ 41 ("[T]he trial judge is required to impose prison terms for the two most serious specifications, and could also, in its discretion, impose a sentence for any other specification.").

{¶ 103} Welninski is not challenging the trial court's mandatory imposition of consecutive sentences for the first and second 3-year firearm specifications. Instead, Welninski challenges the discretionary imposition of consecutive sentences for the third 3-year firearm specification and the five, 1-year firearm specifications. He argues that the trial court abused its discretion in imposing multiple, consecutive sentences because "each charge in case number 16-CR-039 resulted from a single series of events which took place at Icon's Bar and immediately thereafter" and involved only "one gun."

{¶ 104} We disagree. By operation of R.C. 2929.14(B)(1)(g), the trial court was within its discretion to impose separate firearm specifications, "without considering

45.

whether the conduct was part of the same act or transaction." *State v. Hudson*, 8th Dist. Cuyahoga No. 102767, 2015-Ohio-5424, ¶ 27, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 34. As noted by Twelfth Appellate District, the statute is "unequivocal" and there is no need to engage in statutory interpretation. *State v. Israel*, 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876, ¶ 70 ("The plain language of the statute provides the trial court with discretion to impose a prison term for any of the remaining specifications.").

{¶ 105} Welninski also argues that the consecutive sentences amount to "duplicate enhancements for the same conduct, and that duplication is inherently unfair." But Welninski fails to show how the trial court abused its discretion, or provide any authority in support of his claim.

{¶ 106} In the absence of any evidence that the trial court abused its discretion in ordering the firearm specifications to run consecutively in this case, we do not find any error by the trial court. *Accord, State v. Hale*, 5th Dist. Muskingum No. CT2016-0048, 2017-Ohio-2844, ¶ 44 ("Based on the number of victims, the number of serious crimes committed by Appellant, and the violent nature of those crimes, we find no abuse of discretion in the trial court's imposition of consecutive sentences on seven firearm specifications in this matter"); *State v. Nelson*, 8th Dist. Cuyahoga No. 104336, 2017-Ohio-5568 (The trial court did not err in imposing consecutive sentences for the three-year firearm specifications on defendant's aggravated murder, attempted murder, and aggravated robbery counts and trial court had no obligation to make findings "of any kind" before ordering him to serve the three-year firearm specifications consecutively).

46.

{¶ 107} We therefore find Welninski's first assignment of error not well-taken.

### 6. Costs of Prosecution

{¶ 108} In his sixth and final assignment of error, Welninski argues that the trial court erred when it imposed the costs of prosecution without considering his present or future ability to pay.

{¶ 109} In its judgment entry, the trial court issued a single sentence with regard to costs: "The Defendant shall pay the costs associated with these cases and judgment for such costs is hereby awarded to Wood County." Welninski argues that "[b]ased upon the length of [his] sentence, including mandatory time, the trial court erred by not conducting an inquiry into [his] ability to pay the costs associated with his case."

{¶ 110} Our standard of review on this issue is whether the imposition of costs and financial sanctions was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b). *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060, L-15-1061, 2016-Ohio-1571, ¶ 4, citing *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 30 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law.").

{¶ 111} With regard to the costs of prosecution, R.C. 2947.23(A)(1)(a) provides that the trial court shall include in every sentencing judgment the costs of prosecution without consideration of whether the defendant has the ability to pay such costs. *State v. Rohda*, 6th Dist. Fulton No. F-06-007, 2006-Ohio-6291, ¶ 13. Therefore, we conclude that the trial court did not err by imposing the costs of prosecution against Welninski. Also, we note that a trial court has the discretion to waive payment of court costs upon

47.

the filing of a motion by the defendant. R.C. 2949.092; *State v. Joseph*, 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, ¶ 11. Although Welninski did not file such a motion, he may do so in the future. R.C. 2947.23(C) provides that the trial court retains jurisdiction to address the waiver, suspension, or modification of the payment of court costs. Therefore, Welninski need not have moved at the time of sentencing for waiver of the payment of costs. *State v. Farnese*, 4th Dist. Washington No. 15CA11, 2015-Ohio-3533, ¶ 12-16.

{¶ 112} Welninski's assignment of error is limited to challenging the costs of prosecution. However, to the extent that the trial court intended to impose the costs of Welninski's appointed trial counsel and/or the costs of his confinement by stating that "[t]he defendant shall pay the costs associated with these cases * * *," we find that the record does not support the imposition of either. Regarding attorney fees, the record contains no evidence that Welninski "has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person." R.C. 2941.51(D). Likewise, Welninski would not be subject to the costs of his confinement under R.C. 2929.18(A)(5) absent some indicia that the trial court properly considered his ability to pay. *See State v. Woods,* 6th Dist. Lucas No. L-15-1024, 2016-Ohio-545. To the limited extent that the trial court imposed the costs of confinement and/or appointed counsel, we vacate that portion of the sentencing entry.

{¶ 113} Welninski's sixth assignment of error is found not well-taken.

48.

## Conclusion

**{¶ 114}** Based on the foregoing, Welninski's attempted murder and felonious assault convictions, in case No. 15-CR-552, are allied offenses of similar import that must have been merged by the trial court. This matter is remanded for the limited purpose of resentencing Welninski. The state will elect which conviction to pursue for sentencing purposes.

**{¶ 115}** Welninski's conviction and sentence is affirmed in all other respects. Welninski is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

Thomas J. Osowik, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

49.