[Cite as *State v. Tellis*, 2020-Ohio-6982.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                          Court of Appeals No. WD-19-050

　　　　Appellee                                       Trial Court No. 2018-CR-0274

v.

Christopher Tellis                                   **DECISION AND JUDGMENT**

　　　　Appellant                                      Decided:  December 30, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

W. Alex Smith, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Christopher Tellis, appeals the June 20, 2019 judgment of the Wood County Court of Common Pleas sentencing him to an aggregate prison term of 18 years.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} On June 7, 2018, Tellis was indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony; and one count of kidnapping in violation of R.C. 2905.01(A)(2), a first-degree felony. Each count included a 3-year firearm specification under R.C. 2941.145(A).

{¶ 3} Tellis elected to have his case tried to the court. At trial, the state presented the testimony of Chief Patrick Jones of the Perrysburg Police Department ("PPD");[1] the victim, L.H.; and two forensic scientists from the Ohio Bureau of Criminal Investigation ("BCI"), Devonie Herdeman and Julie Cox. Tellis testified in his own behalf. The following facts were elicited at trial.

### A. The state's case

{¶ 4} According to L.H.'s testimony, late on the night of January 30 or early in the morning of January 31, 2018, she was bound with duct tape, beaten, and robbed at gunpoint while in her home.

{¶ 5} As some necessary background, L.H. is the owner of a legal marijuana-growing operation in Michigan, which operates on an all-cash basis. L.H. admitted on the stand that she had several pounds of marijuana in her home on the night of the robbery, which she said that she used for "personal party favors." She also admitted that, shortly before trial, she was convicted of and sentenced on felony charges related to

---

[1] At the time of the crime, Jones was a detective with the PPD.

2.

bringing 300 vape cartridges containing THC and 20 to 30 pounds of marijuana that she legally grew in Michigan to her home in Perrysburg. The man L.H. had been dating for approximately two months at the time of the robbery, Johnny Elliot, knew about her business and knew that she kept large amounts of cash and marijuana in her home.

{¶ 6} The events that led to the robbery began when Elliot contacted L.H. while she was at a basketball game to ask if several of his friends could come to L.H.'s home that evening. L.H. had met the friends—who she knew as Derrick Tate, Monty, and Monty's girlfriend—about a week before, but was reluctant to have them over because it was 10:00 p.m. on a Tuesday and Elliot was working and would not be at L.H.'s house with them. L.H. eventually relented, though.

{¶ 7} About 45 minutes later, Tate arrived, and L.H. let him into the house. After he entered, L.H. locked the door. L.H. testified that she normally keeps her doors locked and has a security system that she keeps "on the maximum setting at all times" that loudly says "front door" when her front door is opened and "back door" when her back door is opened.

{¶ 8} After Tate arrived, he and L.H. stood in the kitchen talking. When Tate asked for a drink, L.H. got a bottle of liquor so that he could pour himself a shot, and she agreed to take one shot with him. After they took the shots, Tate told L.H. that Monty would be there soon.

{¶ 9} Monty and his girlfriend arrived approximately 20 to 30 minutes after Tate. After letting them into the house, L.H. locked the door. The three of them went into the kitchen with Tate where L.H. gave Monty a bottle of liquor and Monty's girlfriend a

3.

bottle of wine and told them to pour themselves drinks. They talked for a while, and L.H. got out some marijuana for her guests to smoke. After approximately 15 minutes, Monty's girlfriend said that she was hungry and wanted to go to Waffle House. She asked L.H. if she wanted anything from the restaurant, which L.H. declined, asked Monty for some money, and then left. L.H. said that she "was no longer on [her] A-game" and did not lock the door when Monty's girlfriend left. Sometime between two and five minutes after Monty's girlfriend left, Monty followed her. According to L.H., "literally 30 or 45 seconds later * * * the gunman walked in with the gun up."

{¶ 10} When the gunman first came in, L.H. thought it was Elliot playing a joke on her. The gunman told her to get on the floor, but she "just looked at him, probably like a deer in headlights." She said that Tate was standing next to her and "put on a comedy show. He—after I did not oblige by the intruder's demands to get down, I looked at Derrick like, what the—what is going on? And Derrick put his arms up and goes, oh, my God, and pretended to get on the floor." After Tate got on the floor, the gunman grabbed L.H. by the back of her shirt and shoved her toward the basement door, which was next to where she was standing in the kitchen. She said that the gunman was very close to her while he was doing this, and she was able to see his face.

{¶ 11} The gunman shoved L.H. down the basement stairs. While he was moving her, he demanded to know where L.H. kept her money and marijuana. When they reached the bottom of the stairs, the gunman laid L.H. face down on the concrete floor next to the stairs and told her not to move. Once L.H. was lying on the floor, the gunman "kind of half-heartedly hit [her] with the pistol on the back of the head." She said that

4.

she could tell that "he didn't really want to hit me, but he did.  And then he must have got a little bit more bold, because at that point he was like, I told you not to move, and he smacked me again with the pistol.  That's when my face hit the concrete * * *."  After hitting her, the gunman told her not to move and then went back upstairs.  The gunman left Tate upstairs without securing him in any fashion while he took L.H. to the basement.

{¶ 12} The gunman was gone for approximately five minutes.  During that time, L.H. stayed on the floor in the basement, but said that she could hear "multiple feet running around upstairs."  When the gunman came back down to the basement, he used duct tape to bind L.H.'s hands behind her back.  He again demanded to know where L.H. kept her money and "continued to beat [her] on the back of the head with the pistol."  L.H. told him that she kept her money at her marijuana farm in Michigan, and if he took her to the farm, she would give him whatever he wanted.

{¶ 13} The gunman went back upstairs.  L.H. wriggled her hands out of the duct tape, but realized that she did not have any weapons or safe means of escape.  She tried to put her hands back in the tape before the gunman returned to the basement, but he could tell that she had gotten it off and was angry, so he "beat" her, "kicked" her, and then went back upstairs to get another person.  When he and the other person returned, they pulled the hood of her sweatshirt over her head and "mummy-taped" her with duct tape by wrapping the tape around her body from "neck to waist.  And legs."  She did not see the other person who came to the basement, but knew two people were there because one person held her and one person wrapped the tape around her.

5.

{¶ 14} After L.H. was taped up, the gunman held his gun to her head and said, "bitch, don't move, don't you dare think about moving, I will kill you." The gunman then ran up the basement stairs, slammed the basement door, left the house, and slammed the front door. She thought that the robbery lasted about an hour.

{¶ 15} At trial, L.H. identified Tellis as the person who robbed and assaulted her. She was sure that Monty and Monty's girlfriend had left the house before the gunman came in and that she and Tate were the only two people in the house when the gunman entered, but that she was the only person duct taped. During the robbery, L.H. did not hear her alarm system go off to indicate that either the front or back door of the home had been opened.

{¶ 16} After the gunman left, L.H. immediately began trying to get out of the duct tape wrapped around her body, which she claimed took about five minutes. She also said that she still had duct tape on her body when she left her house and that some of the tape ended up on her driveway. Once she was free, she ran to her neighbor's house for help. She "frantically" knocked on her neighbor's door, but then said to herself, "you do not want to meet your neighbors like this, get your shit together and go back in the house. So that's what I did." L.H. did not call 911 because she "just wasn't thinking straight" and because the robbers had taken her cellphone. They also took her car keys, about $1,200 that L.H. had sitting on the counter, and "old money" that L.H. collects.

{¶ 17} Using her computer, L.H. was able to contact a friend who came and took her to the hospital. Hospital staff contacted the PPD. The state offered into evidence pictures of L.H. that the police took when they responded to the hospital on the morning

6.

of January 31, 2018, that show her injuries. One picture shows that her right eye was badly bruised and swollen shut, there was some swelling and bruising around the bridge of her nose, and there was dried blood on her face. She said that each time the gunman hit her in the back of the head with his pistol, her face hit the concrete floor. She did not break any of the bones in her face, but at the time of trial—nearly one and one-half years after the robbery—she was still unable to move one of her eyebrows. Another picture shows the area of her scalp where the gunman hit her with his pistol and cut her. The police also took pictures of L.H.'s injuries two days later that show dark bruising around both eyes, bruising over much of the right side of her face, swelling around her face, and bruising behind both of her ears.

{¶ 18} On cross-examination, Tellis's counsel asked L.H. about an alternate version of events from that night. Counsel's theory was that Tellis and L.H. were involved in a drug deal gone wrong. He established that, at the time of the robbery, L.H.'s marijuana farm in Michigan produced 80 pounds of marijuana a month, which was worth $1,800 per pound, and that she had to pay taxes on the marijuana she produced. L.H. also agreed that she did not call the police herself, changed her mind about seeking help from her neighbor, and did not ask the friend who took her to the hospital or hospital staff to call the police. But when counsel asked L.H. if Elliot and Tate had acted as middlemen to broker a drug deal with Tellis purchasing 10 pounds of marijuana from L.H. at $1,200 per pound, L.H. responded that "[t]hat is very inaccurate." She also said that it was "inaccurate" that she was reluctant to involve the police that evening because she was trafficking drugs. L.H. said it was "[f]alse" that Tellis came into the house with

7.

Tate and had a drink with her and Tate. And L.H. denied that a different, unknown person came into L.H.'s home that night and tied up both her and Tellis before stealing the money and marijuana in L.H.'s home. On redirect, L.H. confirmed that she had not met Tellis before the night of the robbery and was not introduced to him that night.

{¶ 19} Regarding the duct tape the robbers used to bind L.H., she agreed with counsel that it took a "tremendous" amount of tape to tie her up, but other than the wad of duct tape that fell off of her body in her driveway, she did not know where the rest of the tape went. She said that she did not have any tape on her when she went to the hospital.

{¶ 20} As to L.H.'s identification of Tellis, on direct, she described the gunman as "about 6-foot and thick." On cross-examination, L.H. claimed that she did not remember initially describing the gunman to Jones as "6-foot tall and slim," but agreed that she could have said that. When counsel pressed her on the issue, the following exchange occurred:

[Counsel:] So being slim and being thick are different, vastly different, correct?

[L.H.:] It's in the eye of the beholder.

[Counsel:] You're the one making the identification, ma'am.

[L.H.:] Sure.

[Counsel:] And you said he was slim at the time this happened.

[L.H.:] Okay.

[Counsel:] Now you're saying he was thick?

[L.H.:] Yes, as I recall.

8.

{¶ 21} The state also called Jones to testify about his investigation of the crime. He said that he was called to Mercy Hospital in Perrysburg around 2:00 a.m. on January 31, 2018, to investigate a report of a woman who was robbed and pistol whipped. He met with L.H. at the hospital and spoke to her for about an hour.

{¶ 22} After speaking with L.H. at the hospital, Jones went to her home to continue his investigation. In the kitchen, he found two large plastic bags that contained approximately two pounds of marijuana, which he seized. In the basement, he found used duct tape in two separate areas on the floor and blood stains on the floor near each wad of used tape. Jones collected the duct tape as evidence and sent it to BCI for DNA and fingerprint analysis. Officers also collected duct tape from L.H.'s driveway and her hair that it sent to BCI for testing.

{¶ 23} L.H. had an office on the second floor of her house. When Jones searched the upstairs of the home, he saw that the desk drawers had been opened and appeared to have been riffled through. He recalled finding some cash in the office, but did not recall how much was there.

{¶ 24} Jones admitted that he initially had "no clue" who the gunman was. He knew that L.H. had been dating Elliot, and that Elliot was not at the house that night, but had been there before. He also knew that Elliot's friend, Tate, was there, along with "someone possibly by the name of Monty, who was maybe from the Lima area, and his girlfriend, and I don't know what her name was." However, he had no leads on the identity of the gunman.

9.

{¶ 25} Jones's investigation confirmed that Elliot and Tate knew each other; they had played on the same college basketball team. He also learned that Elliot had most recently been staying in Sylvania and with L.H., and Tate lived in Michigan City, Indiana. Jones obtained search warrants for Elliot's and Tate's social media accounts and cellphone records, and learned that the men had been messaging each other around the time of the robbery. He said that there were "[c]onversations about Derrick heading over to [L.H.'s] house, and comments about having—that Derrick was having a guy come. And there seemed to be talk on cell phone [sic] messages between Johnny and [L.H.] about setting up possibly a drug deal."

{¶ 26} In late March 2018, Jones received a letter from BCI that it had found DNA on some of the duct tape and had matched it to Tellis through CODIS. Jones found addresses for Tellis in the Chicago area and in the Michigan City area. Based on that information, the case was presented to the grand jury, which indicted Tellis.

{¶ 27} Tellis was arrested in December 2018 and extradited to Ohio. Jones interviewed Tellis while he was in jail both to get information about the case and to execute a warrant for Tellis's DNA. When the prosecutor was inquiring about Jones's interview with Tellis, the prosecutor asked if Jones questioned Tellis about Tate. Jones responded:

> Yes. I basically explained to Mr. Tellis what my theory of this case was, told him I wanted to talk to him about it. I asked him if he knew Derrick Tate. Mr. Tellis indicated that he knew him as DT. And we talked for a little bit. *And then he decided he wanted to speak with an attorney*

*because he didn't want to incriminate himself and wanted some advice.*

(Emphasis added.)

At this point, unprompted by defense counsel, the trial court chastised the prosecutor for allowing the witness to comment on Tellis's silence, and the following exchange occurred:

> THE COURT:  [Prosecutor], I would just indicate that if there was a jury sitting here I'd declare a mistrial at this point, comment on the silence. That should not have been in this testimony.  Good thing there was not a jury.
>
> [PROSECUTOR]:  Well, hopefully—I know the Court can put aside those type of things, because this is a bench trial.
>
> THE COURT:  That's right.
>
> [PROSECUTOR]:  [Defense counsel] has not actually asked for a mistrial.  I'm not sure if he wants to.
>
> [DEFENSE COUNSEL]:  I'm prepared to go forward, Judge.
>
> THE COURT:  Thank you.

{¶ 28} The state next played the video recording of Jones's interview with Tellis. Jones read Tellis his *Miranda* rights, and Tellis initially waived his rights.  The brief interview primarily consisted of Jones telling Tellis his theory about what happened the night of January 30, 2018.  Less than five minutes into the interview, after Jones told Tellis that his DNA had been found "on the sticky part" of some of the duct tape used to tie up L.H. and that he knew that Tellis was at the scene, but wanted to know what Tate's

11.

role in the crime was, Tellis said that he did not want to "incriminate" himself or "put [himself] in jeopardy" because he did not really know what was going on and did not know Jones's motives. He said that he would be willing to talk to them "in front of a lawyer," but he needed to "take care of" himself. The state played this portion of the video for the court. Again, unprompted by defense counsel, the trial court chastised the prosecutor for allowing evidence commenting upon Tellis's silence into the record:

THE COURT: [Prosecutor], I again would caution you, this tape should not have been played the way it was played. There's a direct comment on the defendant exercising his right to remain silent. That should have been excised from the tape. If there was a jury, again, sitting here I would have no qualms about granting a mistrial. We can't introduce evidence during a criminal case about a defendant asking for an attorney. That should have been excised from the tape, it should not have been in the officer's testimony. I'm quite surprised, to be honest with you.

[PROSECUTOR]: Your Honor, it would not have been played to the jury. It's because it's a Court trial.

THE COURT: I know. And I'm a judge and I can make that distinction. But it should not have been presented as evidence in a criminal case, either through testimony from the officer or from the tape that was just played. But anyway, let's continue. Maybe we can get through this.

{¶ 29} On cross-examination, Jones confirmed that his initial assessment of the case, based on the messages between Elliot and Tate, and the evidence found at L.H.'s

12.

home—such as a scale, a cash counter, and a bag sealer—was that this was a case of a "drug deal gone bad." He also confirmed that Mercy Hospital staff—not L.H.—called the police, and said that L.H. would not give the PPD written consent to search her house, but did give them verbal consent to conduct a search.

{¶ 30} Jones could not remember if anyone took a picture of the duct tape found in the driveway or how much duct tape was in the driveway. He recalled was that the tape was "stuck together, part of it was stuck together[,]" and that it looked similar to the duct tape that he found in the basement of L.H.'s house.

{¶ 31} Regarding his investigation, Jones said that he contacted the Lima police to see if they knew who Monty was, but he was unable to get any information. He was also unable to find out Monty's girlfriend's name. No one from the PPD checked either Waffle House location in Perrysburg to see if Monty or Monty's girlfriend actually went to get food when they left L.H.'s house. Jones also said that no one at the PPD created a photo array to show L.H. so that she could identify Tellis or Tate, but said that L.H. had "started looking on social media accounts * * *" to identify the person who assaulted her. However, Jones wrote in his report that L.H. said that "she would recognize his face if she saw him again."

{¶ 32} The state also called two BCI analysts to testify regarding the DNA evidence. Cox was the BCI analyst who took cuttings from the evidence that the PPD collected from L.H.'s house so that the evidence could be tested for the presence of DNA. The two cuttings of tape that ultimately proved to have Tellis's DNA on them came from two separate wads of tape that were found in the same area of the basement and were

13.

submitted as one item of evidence. Cox took two cuttings from each piece of tape, one before the tape was examined by a fingerprint analyst and one after. One of the cuttings with DNA on it came from the end of the larger piece of tape that was exposed before the fingerprint analyst unwound the tape. The other cutting with DNA on it came from the end of smaller piece of tape that was exposed after the fingerprint analyst unwound the tape. The other two cuttings did not have DNA on them. After Cox took the cuttings, she sealed them in labeled DNA extraction tubes and sent them to the BCI property room until they could be transported for DNA testing.

{¶ 33} The other BCI analyst was Herdeman, who conducted the DNA analysis after DNA was extracted from the evidence that the PPD collected. She testified that there was DNA that was suitable for comparison on three pieces of tape from L.H.'s basement and on swabs taken from a soda bottle, but was no DNA in sufficient quantity or quality for comparison on a duct tape roll or the used tape from the driveway. Herdeman said that the swabs from the soda bottle and one of the pieces of tape from the basement contained a mixture of L.H.'s DNA and male DNA that was not interpretable. Herdeman was able to exclude L.H. as a contributor of DNA on the other two pieces of tape from the basement that were both discarded in the same area of the basement. However, on the larger piece of tape, Herdeman found a mixture of DNA from an unknown male in a sufficient quantity for comparison and additional DNA data that was not interpretable. On the smaller piece of tape, Herdeman found only DNA from the

14.

same unknown male in a sufficient quantity for comparison. BCI did not test for the type of bodily fluid that the DNA on these items came from, so Herdeman could not say whether it was blood, sweat, or saliva.

{¶ 34} As part of her analysis, Herdeman submitted the unknown male's DNA profile to the CODIS database. In March 2018, she learned that the profile matched to Tellis, and she sent the PPD a letter informing them of the match. After Jones collected a DNA swab from Tellis pursuant to a search warrant, Herdeman conducted another analysis that compared Tellis's DNA standard to the unknown male's profile found on the tape from L.H.'s basement. She found that the profiles matched and that the estimated frequency of the occurrence of the same DNA profile in unrelated individuals was "rarer than 1 in 1 trillion." She also found that Tellis was the major contributor of DNA to the mixture on the larger piece of tape. The other DNA in the mixture on the larger piece of tape was insufficient in either quantity or quality for Herdeman to make a comparison.

{¶ 35} In response to a question by the court, Herdeman said that the entire cutting from each piece of tape that was tested was put into the test tube, so she was unable to say whether the DNA that was identified came from the adhesive or nonadhesive side of the tape.

{¶ 36} On cross-examination, Herdeman said that none of the evidence submitted by the PPD included swabs of possible bloodstains.

15.

## B. Tellis's case

{¶ 37} Following the presentation of the state's case, Tellis moved for dismissal under Crim.R. 29, which the trial court denied. After that, Tellis opted to testify in his own behalf.

{¶ 38} Tellis testified that he lived in Michigan City, Indiana. He met Tate— whom he knew as DT—in the early summer of 2018[2] "through a friend of a friend" and had a "business relationship" with Tate that revolved around buying and selling marijuana in Indiana, where Tellis lived. According to Tellis, he did not know Elliot, Monty, Monty's girlfriend, or L.H.

{¶ 39} In late December 2018, Tate made Tellis aware of an opportunity to buy marijuana in Perrysburg, which Tellis was interested in because the price of $1,200 to $1,400 per pound was significantly cheaper than the cost of $2,400 to $2,500 per pound that he was paying in the Chicago area. Tellis and Tate arranged by phone for Tellis to buy 10 pounds of marijuana at $1,200 per pound, for a total cost of $12,000. The only contact person Tellis had regarding the deal was Tate; he did not know where the deal would happen or who he was buying from.

{¶ 40} On the night of the robbery, Tate drove Tellis to Perrysburg from Michigan City. Their sole purpose for the trip was to purchase marijuana. Tellis said that the only thing Tate told him about the identity of the seller was that it was a woman. Tellis did

---

[2] Based on Tellis's admission that he was in L.H.'s house in January 2018, we presume that he met Tate before the summer of 2018 and had his dates confused throughout his trial testimony.

not have a weapon on him, but did have $12,000 in cash, which he carried in the front pocket of his hoodie. Tellis did not have his cellphone with him that night because he "[d]idn't think about grabbing * * *" it. He said that Tate was making phone calls and texting people during the drive to Perrysburg.

{¶ 41} When they arrived at L.H.'s home, Tellis said that he and Tate went to the door, Tate knocked, and L.H. let them in. They all went into the kitchen and had drinks. Monty and Monty's girlfriend were also in the kitchen drinking. After drinking and making small talk for a while—but not discussing the drug deal—Monty's girlfriend left. Tellis did not hear her say why she was leaving. Although Monty was still there when his girlfriend left, Tellis lost track of him shortly after.

{¶ 42} Then, "[t]he next thing you know, click, gun to the back of my head. So, you know, I didn't move. * * * I'm looking at [L.H.], like she said, she froze." Tellis could not see who was holding the gun to his head. After that, someone grabbed him by the back of his shirt and walked him down to the basement. He did not fight back because he had a gun to his head. The person who was leading him to the basement did not say anything to him.

{¶ 43} As he got closer to the bottom of the basement stairs, Tellis could see what he estimated to be "about 20, 30 pounds or better" of marijuana. He said that "[t]here was marijuana all over the table, all in boxes, all in the corner floors, just marijuana everywhere." He also said that he could smell the marijuana and that it was "real loud." It occurred to Tellis at this point that the robbery was likely related to the marijuana that L.H. had in her house.

17.

{¶ 44} When Tellis and the gunman reached the bottom of the stairs, Tate, who was already in the basement and was texting on his phone, saw Tellis and the gunman and "threw his hands up in the air and instantly laid on the floor." Tellis said that the gunman "take me, laid me down, tie me up, and put my hood over my head." In doing so, the gunman used duct tape to bind Tellis's hands behind his back, as if he were being handcuffed, but did not bind him anywhere else on his body. He said that someone "[c]ould have" struck him during the robbery, and that he was hit in "[j]ust the head probably." He did not recall if he was bleeding, though.

{¶ 45} After securing Tellis, the robbers brought L.H. to the basement. Tellis's hood was over his eyes, so he could not see what was happening, but he could hear what was going on. According to him, L.H. was not cooperating with the robbers. He heard them "telling her, be still, do this, do this, do that, she wasn't cooperative." He could hear the robbers striking L.H. He, however, "didn't move because my life in danger * * *." He also said that he "heard trash bags like they was getting all the marijuana stuff, boxes and stuff they had flipped over." After that, someone "came and searched me, took my money." He said that the person took all of the $12,000 in cash that he had in his front hoodie pocket.

{¶ 46} Tellis could not recall how long he was in the basement, but, eventually, everything got quiet. At that point, he "just look up" and saw L.H. He thought she was dead because of all of the blood, so he got the duct tape off of his hands, threw it on the basement floor, and ran out of the house. He said that he did not help L.H. because he was at her house doing something illegal. Once he left the house, he said that he just ran.

18.

He did not have his phone and did not know where he was because he was not from the area, but he eventually ran into a couple who were driving and stopped for him. He told them what happened, and they let him use their phone to call his cousin and dropped him off at a motel where Tellis walked around outside until his cousin arrived from Michigan City to pick him up.

{¶ 47} Tellis said that he never saw Tate again after that night. He also said that he never called the police about the robbery because he was at L.H.'s house to buy 10 pounds of marijuana and "why would I get the police involved with something that's illegal?" He claimed that he never touched L.H. and did not steal any money or marijuana from her house.

{¶ 48} On cross-examination, Tellis explained that he met Tate when a friend he knew only as Lucky brought Tate to his home in the summer of 2018 and introduced Tate as someone who could, essentially, broker marijuana purchases. At first, Tellis did not know where Tate sourced the marijuana from, and, although he knew he was coming to Ohio to make the purchase, Tellis did not know the specific location he was traveling to or person he was buying from. He could not remember exactly when he and Tate first talked about Tate having a source in the Toledo area for cheaper marijuana, but said that they had discussed it off and on over a couple of months. The night of the robbery was the first time Tellis tried to make a purchase through Tate.

{¶ 49} Regarding the events of January 30, Tellis said that Monty and Monty's girlfriend were already at L.H.'s house when he and Tate arrived. When they came into the kitchen, Tate introduced him to everyone as Chris, and they all drank and made small

talk for approximately 10 to 20 minutes before Monty's girlfriend left and the gunman came into the kitchen. He clarified that Tate had gone down to the basement sometime before the gunman entered the house, and that he, Monty, and L.H. were the only ones in the kitchen when the gunman arrived. When the prosecutor asked if the gunman left Monty and L.H. unattended in the kitchen while he was taking Tellis to the basement, Tellis said that he did not know what went on in the kitchen after the gunman started walking him down the stairs because he could not see behind him. Although Tellis repeatedly referred to "them" when discussing the robbers, he was unable to say how many people were in the house.

{¶ 50} The state tried to get Tellis to describe, specifically, what he heard after the gunman bound his hands and covered his eyes, but the most specificity that Tellis could provide was that "all I heard is basically telling her to stop moving, stop doing this, stop doing that."

{¶ 51} When the robbers were gone and Tellis managed to wiggle out of his bindings, Tate was gone. Tellis assumed that Tate had set him up that night. Regardless, he did not call Tate after that night to ask about what happened. He explained that "being in the streets, sir, that's part of the game. That comes with the life that you chose to live. You've got to take—you got to be willing to accept losses like that * * *." He also said that he was unable to retaliate against Tate because he had been to prison before.

{¶ 52} Following his testimony, Tellis rested.

20.

## C. Verdict and sentencing

{¶ 53} The next morning, the trial court announced its verdict. It found Tellis guilty on all three counts and the attached firearm specifications.

{¶ 54} Tellis elected to go directly to sentencing. After hearing from counsel and offering Tellis an opportunity to speak, which he declined, the court heard a victim impact statement from L.H. Following L.H.'s statement, the court noted that it "didn't believe all of [her] testimony. There was more to it than what you testified to." The court then imposed its sentence.

{¶ 55} First, on the aggravated robbery count, the court sentenced Tellis to 8 years in prison, plus an additional, mandatory 3 years for the firearm specification, which the court ordered Tellis to serve prior to and consecutively to the 8-year term for the aggravated robbery. Next, on the felonious assault count, the court sentenced Tellis to 4 years in prison, plus an additional, mandatory 3 years for the firearm specification, which the court ordered Tellis to serve prior to and consecutively to the 4-year term for the felonious assault. The court ordered that the aggravated robbery and felonious assault sentences be served consecutively. Finally, the court found that the kidnapping count merged with the aggravated robbery count, so it did not impose a sentence for that conviction.

{¶ 56} Tellis now appeals, raising three assignments of error:

I. The Trial Court Erred When It Did Not Declare a Mistrial[.]

II. The Trial Court Erred When It Found The Defendant Guilty Against The Manifest Weight of the Evidence[.]

III.  The Trial Court Erred By Not Merging All Counts and For Not Conducting a *Johnson* Analysis.

## II.  Law and Analysis

### A.  The trial court did not commit plain error by failing to sua sponte declare a mistrial.

{¶ 57} In his first assignment of error, Tellis argues that the trial court erred by failing to declare a mistrial after the state allowed its witness to comment upon Tellis's right to remain silent and then played a portion of the police interview that included Tellis asserting his right to remain silent.  The state responds that the trial court did not commit plain error by failing to sua sponte declare a mistrial because this was not a jury trial, the judge indicated that he would not consider the evidence that was improperly before the court, and Tellis's counsel did not object to the references to Tellis's right to remain silent or ask for a mistrial.

{¶ 58} Granting or denying a mistrial rests in the sound discretion of the trial court because the trial judge is in the best position to determine if the situation in the courtroom warrants a mistrial.  *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988).  So, generally, we review the trial court's decision for an abuse of discretion.  *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).  However, when the defendant fails to move for a mistrial, we review the trial court's failure to declare a mistrial for plain error.  *State v. Wright*, 6th Dist. Lucas No. L-16-1164, 2018-Ohio-668, ¶ 14.  Plain error is an error that affects an appellant's substantial rights.  Crim.R. 52(B).  An error that affects substantial rights is one that "affected the outcome of the trial."  *State v. Barnes*, 94 Ohio

22.

St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 59} Here, we cannot find that the trial court's failure to sua sponte declare a mistrial, in a bench trial, rises to the level of plain error. Comment on a defendant invoking his right to remain silent is undoubtedly improper. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 68, citing *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ("It is improper for either the prosecutor or the court to comment on a defendant's invocation of his right to remain silent."). However, the impact of such a statement is lessened in a court trial because "'[j]udges, unlike juries, are presumed to know the law. Judges are trained and expected to disregard any extraneous influences in deliberations.'" (Brackets sic.) *Id.*, quoting *State v. Davis,* 63 Ohio St.3d 44, 48, 584 N.E.2d 1192 (1992).

{¶ 60} The trial court in this case clearly indicated that it knew that the evidence the state presented was improper and that it could "make [the] distinction" between proper and improper evidence. It also agreed with the state that it could "put aside those type of things * * *." There is no indication in the record that the trial court's decision was influenced by the comments on Tellis's silence or that the outcome would have been different if the state had not put the improper evidence before the court. Accordingly, we find that the trial court did not commit plain error by failing to declare a mistrial. Tellis's first assignment of error is not well-taken.

23.

**B. Tellis's convictions are supported by the manifest weight of the evidence.**

{¶ 61} In his second assignment of error, Tellis argues that the trial court lost its way in convicting him because the evidence does not weigh heavily in favor of his conviction and the questions surrounding the state's evidence created reasonable doubt about his guilt. The state responds that the trial court was free to believe L.H.'s version of events over Tellis's and give little weight to Tellis's argument that he could not have been the gunman because his DNA did not appear on any of the same evidence as L.H.'s DNA.

{¶ 62} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 63} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the trial court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. "Moreover, it is

24.

inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable [trier of fact] could not find the testimony of the witness to be credible." (Internal quotations omitted.) *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 27 (6th Dist.).

{¶ 64} Here, our careful review of the record shows that a reasonable trier of fact could find L.H.'s testimony credible and thus could find Tellis guilty of aggravated robbery, felonious assault, kidnapping, and the firearm specifications.

{¶ 65} To begin, we address the issue of L.H.'s credibility. While the trial court said at sentencing that it "didn't believe *all* of [her] testimony" and that there "was more to it than what [L.H.] testified to," the court in no way indicated that it disbelieved her testimony in its entirety. (Emphasis added.) To be sure, there is evidence to suggest that L.H. might not have been telling the whole truth—for example, the messages that Jones found between Elliot and L.H. that appeared to be arranging a drug deal and the apparent inconsistency between the amount of tape L.H. said was used to bind her and the amount that the police recovered from her house. But there are also portions of Tellis's testimony—such as his inability to recall whether he was struck in the head with a gun, whether he was bleeding, and what, specifically, he heard while he was tied up in L.H.'s basement—that are equally questionable. Being mindful that the trial court is in the best position to assess the witnesses' credibility, we cannot find that the court erred by believing L.H. over Tellis in this case.

{¶ 66} With that in mind, we cannot find that Tellis's convictions are against the manifest weight of the evidence. To convict Tellis of aggravated robbery, the trial court

25.

was required to find that Tellis, in committing a theft offense, had a deadly weapon on or about his person or under his control and that he displayed, brandished, indicated that he possessed, or used the weapon. R.C. 2911.01(A)(1). To convict Tellis of felonious assault, the trial court was required to find that Tellis knowingly caused physical harm to L.H. by means of a deadly weapon. R.C. 2903.11(A)(2). "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). To convict Tellis of kidnapping, the trial court was required to find that Tellis, by force or threat, moved L.H. or restrained her liberty for the purpose of facilitating the commission of aggravated robbery. R.C. 2905.01(A)(2). "Force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). And to convict Tellis of the firearm specifications, the trial court was required to find that Tellis had a firearm on or about his person or under his control and displayed, brandished, indicated that he possessed, or used the firearm to facilitate the offense. R.C. 2941.145(A). A gun is both a deadly weapon and a firearm. *In re Marcus T.D.*, 6th Dist. Lucas No. L-02-1376, 2004-Ohio-477, ¶ 9; R.C. 2923.11(A), (B); *see also State v. Vondenberg*, 61 Ohio St.2d 285, 289, 401 N.E.2d 437 (1980) (trier of fact can draw reasonable inferences about the deadly nature of a weapon used in the commission of a crime).

{¶ 67} The evidence presented at trial showed that a person—whom L.H. identified as Tellis based on seeing and remembering his face—(1) came into L.H.'s home, uninvited, with a gun; (2) put the gun to L.H.'s head; (3) grabbed L.H. by her shirt and shoved her down her basement stairs; (4) bound L.H. with duct tape twice to restrain

her from moving; (5) hit L.H. in the head with his gun at least three times; (6) "beat" and "kicked" L.H. when she freed herself from her first set of duct tape bindings; (7) stole at least $1,200 and L.H.'s cellphone; and (8) caused extensive bruising and swelling to L.H.'s face and cuts to her scalp. Taken together, this evidence proved each element of the charges against Tellis.

{¶ 68} As for Tellis's argument that only someone who had been in L.H.'s home before would have known where to find her duct tape, there was testimony that the tape probably came from a drawer in L.H.'s kitchen, but this testimony does not make it "clear that the assailant either had been in the condo before or was told where to locate the duct tape by someone who had been inside the condo before," as Tellis claims. L.H. testified that the gunman took her to the basement, told her not to move, left her there, went back upstairs for approximately five minutes, and then returned and bound her hands with the tape. The gunman very easily could have looked through drawers and cupboards until he found something suitable with which to bind L.H.'s hands and feet during the time that L.H. was alone and unbound in the basement.

{¶ 69} Tellis also relies on the fact that his DNA and L.H.'s DNA do not appear on any of the same pieces of duct tape to support his argument that he was bound by the duct tape found in one area of the basement and L.H. was bound by the tape found in the other area of the basement (i.e., to support his claim that he was also a victim of the robbery, not the perpetrator). Again, Tellis's only argument in this regard is that "[i]t seems obvious that if [Tellis] was the one who taped up [L.H.], that his DNA would have been mixed with hers on the tape." Cox and Herdeman, the forensic scientists who

27.

handled the DNA evidence in this case, were not asked and did not express their opinions on whether they would expect to see both the gunman's and L.H.'s DNA on the same pieces of duct tape, and there is no other evidence supporting this argument. And, as demonstrated by the fact that Cox took two cuttings from each wad of tape that had Tellis's DNA on it, but BCI testing found his DNA on only one cutting from each wad, simply because a person touched something does not necessarily mean that his or her DNA will be found on every part of the object. The trial court was not required to accept Tellis's argument that he could not have been the gunman because his DNA was not found on the same tape as L.H.'s DNA, and its rejection of that argument does not render his convictions against the weight of the evidence.

{¶ 70} In sum, although there are issues with L.H.'s credibility, the evidence does not weigh heavily against Tellis's convictions. Accordingly, we find that Tellis's convictions are not against the manifest weight of the evidence, and his second assignment of error is not well-taken.

### C. The trial court's merger determinations were correct.

{¶ 71} In his final assignment of error, Tellis argues that the trial court should have merged his aggravated robbery and felonious assault convictions and should have merged all three firearm specifications, and that the court erred by failing to conduct a proper merger analysis. The state responds that Tellis committed the aggravated robbery and felonious assault with separate animus, so the trial court properly sentenced him on both counts. It also contends that the trial court "actively considered the doctrine of merger when it both merged Tellis's kidnapping sentence with his sentences for both

28.

aggravated robbery and felonious assault as well as when it made the findings to run the sentences for the aggravated robbery and the felonious assault consecutively."

{¶ 72} R.C. 2941.25 prohibits multiple convictions for "allied offenses of similar import" arising out of the same conduct. The statute states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them. R.C. 2941.45.

{¶ 73} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26. This means that the "'analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases. But different results are permissible, given that the statute instructs courts to examine a defendant's conduct—an inherently subjective determination.'" *Id.* at ¶ 32, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 52.

29.

**{¶ 74}** In *Ruff,* the Supreme Court of Ohio announced that whenever a court considers whether there are allied offenses that merge into a single conviction, the court "must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Id.* at ¶ 25. When considering this overarching question, the court must address three sub-questions: (1) Were the offenses "dissimilar in import," meaning did the offenses involve either separate victims or "separate and identifiable" harm? (2) Were the offenses committed separately? and (3) Were the offenses committed with separate animus? *Id.* at ¶ 23-25. "'An affirmative answer to *any* of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.'" (Emphasis added.) *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *Ruff* at ¶ 31. The defendant bears the burden of establishing that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).

**{¶ 75}** We review de novo a trial court's ruling as to whether convictions merge under the allied-offenses doctrine. *State v. Roberson*, 2018-Ohio-1955, 113 N.E.3d 204, ¶ 12 (6th Dist.).

**{¶ 76}** First, we note that Tellis makes his allied offenses arguments under *Johnson*, which has been rendered "largely obsolete" by subsequent Ohio Supreme Court decisions, including *Ruff*. *Earley* at ¶ 11. Under the *Ruff* test, rather than looking at the elements of the offenses, *see Johnson* at ¶ 48, we first address whether the aggravated robbery and felonious assault offenses were "dissimilar in import"—i.e., whether the

30.

offenses involved separate victims or "separate and identifiable" harm. Here, the offenses undoubtedly involved the same victim, so our inquiry becomes whether they resulted in separate and identifiable harms.

{¶ 77} Tellis was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) and felonious assault in violation of R.C. 2903.11(A)(2).

{¶ 78} Under the relevant aggravated robbery statute, R.C. 2911.01(A)(1), it is illegal for any person while committing, attempting to commit, or fleeing after attempting or committing a theft offense, as defined in R.C. 2913.01, to have a deadly weapon on or about his person or under his control and either display, brandish, indicate that he possesses, or use the deadly weapon.[3]

{¶ 79} A felonious assault conviction under R.C. 2903.11(A)(2) requires the state to prove that the defendant knowingly caused physical harm to another by means of a deadly weapon. "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

---

[3] It is unclear exactly what theft offense the state alleged that Tellis was committing at the time of the robbery. The indictment did not specify which theft offense the state accused Tellis of committing, Tellis did not request a bill of particulars, and the trial court did not specify which theft offense it found that Tellis committed on the night of the robbery. In closing, the state mentioned in passing that Tellis committed a robbery, which is one of the theft offenses listed in R.C. 2913.01(K). However, to find a defendant guilty of robbery, the court must also find that the defendant was "attempting or committing a theft offense * * *" as defined in R.C. 2913.01. R.C. 2911.02(A), (C)(2). The definition of "theft offense" under R.C. 2913.01(K) includes any number of offenses that Tellis's conduct on the night of the robbery violated, but for purposes of our analysis, because Tellis took approximately $1,200 and L.H.'s cellphone, we will presume that the theft offense was theft in violation of R.C. 2913.02(A)(1) ("[n]o person, with purpose to deprive the owner of property * * *, shall knowingly obtain * * * the property * * * [w]ithout the consent of the owner * * *[.]).

31.

{¶ 80} Contrary to Tellis's argument, the harms caused by these two offenses are separate and identifiable. The harm caused by the felonious assault was the physical injuries inflicted on L.H. when Tellis hit her with his pistol and caused her face to hit the concrete floor. The harm caused by the aggravated robbery was the loss of approximately $1,200 and L.H.'s cellphone. That is, the harm caused by the aggravated robbery was harm to L.H.'s property, not her person. This is a harm that is completely different from—i.e., separate and identifiable from—the physical harm to L.H. caused by the felonious assault. *See State v. Johnson*, 6th Dist. Lucas No. L-16-1282, 2018-Ohio-1657, ¶ 42 (aggravated robbery under R.C. 2911.01(A)(1) and felonious assault under R.C. 2903.11(A)(2) caused separate and identifiable harms when the defendant first used a gun to facilitate the theft of the victim's cellphone and then shot the victim).

{¶ 81} Given that we have answered the first prong of the *Ruff* test in the affirmative and determined that Tellis's convictions were dissimilar in import, we need not address the remaining two elements of *Ruff*. *Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, at ¶ 12 ("'An affirmative answer to *any* of the [required questions under *Ruff*] will permit separate convictions.'" (Emphasis added.)). Therefore, we find that the trial court did not err by failing to merge Tellis's aggravated robbery and felonious assault convictions.

{¶ 82} Additionally, we also find that the trial court did not err by failing to merge the firearm specifications attached to the aggravated robbery and felonious assault charges. As explained below, the trial court properly imposed prison terms for the firearm specifications attached to those convictions.

32.

{¶ 83} Sentences for firearm specifications are controlled by R.C. 2929.14(B), which provides, in relevant part:

(B)(1)(a) Except as provided in division (B)(1)(e) of this section, if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in section * * * 2941.145 of the Revised Code, the court shall impose on the offender one of the following prison terms:

* * *

(ii) A prison term of three years if the specification is of the type described in division (A) of section 2941.145 of the Revised Code * * *[.]

* * *

(b) * * * Except as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction.

* * *

(g) If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are * * * aggravated robbery [or] felonious assault, * * * and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division

(B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 84} Generally speaking, a trial court is prohibited by R.C. 2929.14(B)(1)(b) from imposing more than one prison term for multiple firearm specifications associated with felonies that were committed as part of the same act or transaction. *State v. Welninski*, 2018-Ohio-778, 108 N.E.3d 185, ¶ 101 (6th Dist.). However, "R.C. 2929.14(B)(1)(g) serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction." *Id.*

{¶ 85} The sentencing provisions of R.C. 2929.14(B)(1)(g) apply to Tellis because he was (1) convicted of aggravated robbery and felonious assault and (2) convicted of firearm specifications under R.C. 2941.145 on each felony count. Because that section applies, "the sentencing court *shall* impose on the offender the prison term specified under division (B)(1)(a) of this section *for each of the two most serious specifications * * *.*" (Emphasis added.) R.C. 2929.14(B)(1)(g). The language of the sentencing statute is clear: the trial court was required to sentence Tellis on the firearm specifications attached to both the aggravated robbery and felonious assault convictions because they were the two most serious specification of which Tellis was convicted; the trial court could not "merge" the firearm specifications. Accordingly, we find that the trial court did not err by imposing sentences for both specifications.

34.

**{¶ 86}** Tellis's third assignment of error is not well-taken.

### III.  Conclusion

**{¶ 87}** Based on the foregoing, the June 20, 2019 judgment of the Wood County Court of Common Pleas is affirmed.  Tellis is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

Christine E. Mayle, J. _____

Gene A. Zmuda, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.