[Cite as *State v. Girad*, 2025-Ohio-4494.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-24-089

      Appellee                              Trial Court No.  2023CR206

v.

Assad Girad                                    **DECISION AND JUDGMENT**

      Appellant                             Decided: September 26, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Dan Weiss, for appellant.

* * * * *

**ZMUDA, J.**

{¶ 1} Following a guilty plea, defendant-appellant, Assad Girad, appeals the
December 3, 2024 judgment of the Wood County Court of Common Pleas convicting
him of rape and abduction, and sentencing him to an aggregate prison term of 9 to 13.5
years.  For the following reasons, we affirm.

## I. Background

{¶ 2} On May 18, 2023, Girad was indicted on one count each of rape in violation of R.C. 2907.02(A)(2), a first-degree felony; kidnapping in violation of R.C. 2905.01(A)(2), a first-degree felony; and tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The charges arose from an incident at a Bowling Green State University residence hall on April 1, 2023. While visiting a BGSU student, C.D.-H., at her dorm, Girad assaulted her, raped her, and prevented her from leaving the room after the rape.

{¶ 3} Initially, Girad requested a hearing on his competency to stand trial under R.C. 2945.37. At the competency hearing, the trial court found Girad competent to stand trial.

{¶ 4} Following the trial court's competency finding, Girad reached a plea agreement with the state that allowed him to plead guilty to the rape charge and an amended charge of abduction in violation of R.C. 2905.02(A)(2), a third-degree felony. In exchange, the state agreed to dismiss the tampering charge at sentencing.

{¶ 5} At the plea hearing, Girad stipulated that there were sufficient facts in the record to support rape and abduction convictions. After conducting a thorough Crim.R. 11 plea colloquy, the trial court accepted Girad's guilty pleas, found him guilty of rape and abduction, and ordered a presentence investigation.

{¶ 6} At the sentencing hearing, Girad's attorney addressed the court first. She argued for a lesser sentence based on the fact that Girad sustained a traumatic brain injury

2.

in a car accident in 2020, which impacted his ability to interpret facial expressions, tones of voice, and social interactions. As counsel put it, "while [Girad] accepts responsibility for [his actions], he also understands now that there are other mechanisms at work in his brain that affected his ability to make the right choice in that moment." Now that Girad understood how his brain injury affected his decision making, counsel argued, he would not end up in a similar position in the future.

{¶ 7} The court next heard from C.D.-H., the victim. She said that she and Girad met on a dating app, and the first time they met in person was the night of the assault. C.D.-H. had invited Girad to watch a movie in the lounge of her dorm building with her and her friends. Girad came with alcohol and was high on marijuana. After the movie, despite being uncomfortable and wanting Girad to leave, C.D.-H. stayed in the lounge with him to tell him that his behavior was unacceptable. In response, she said,

> Assad did not care and asked if I sucked dick and how good I sucked dick. I told him I do not sick dick and I will never suck his. He kissed me, put me on the chair, took me on top of him. He then stood me up, picked me up, placed me on the chair again. He then pulled his pants down with his penis in front of me, then started begging like a stray dog looking for scraps for me to touch it or put my mouth on it. I told him no and that in high school I was sexually assaulted.

> He then forced me down on the chair, raised my legs so they touched my head. I kept telling him, Assad, no, Assad, no. He entered himself feeling the agony and pain from his penis. Before meeting me that night he knew I was a virgin, that I was on my period, as well as I had bronchitis, and was waiting to have sex until marriage.

> I blacked out, because then we were on the floor next to a small table. He was on top of me. I kept telling him no, pushing his face away and trying to grab my phone to call someone. He flipped me on my

3.

stomach, put his full body pressure on me, hand over my mouth to keep me quiet from yelling Assad, no. He then ejaculated on my leg.

He then got up, pulled up his pants. Then I did as well. He told me he did not know what he was doing, but he knew exactly what he was doing. During his raping, his slides came off.

He forced me to walk to one side of the room, then the other, and demanded my phone. I told him I never wanted to see him again, and he forced me to give him my phone. He took his number out of my phone, deleted the message, and unmatched me from Tinder.

C.D.-H. went on to explain the psychological and emotional impact that the assault had on her.

{¶ 8} When the state addressed the court, it provided additional details of the assault. First, the state explained that Girad and C.D.-H. exchanged many messages through the dating app and texting before they met, and C.D.-H. "was very clear in every single one of these messages" that she "was not looking for a sexual relationship, was not looking to have sex before marriage, wanted to save herself for marriage, wanted to get to know [Girad]." Throughout the night, Girad made "pretty inappropriate" comments to C.D.-H. and "smacked her on the butt." Each time, C.D.-H. told him "no, this isn't what I'm doing, that's not what I want." C.D.-H. and Girad engaged in "some hugging and some kissing" that was consensual, but Girad pushed the limits by trying to play with C.D.-H.'s breasts. C.D.-H. again told him, "no, this is not what I want." After that, Girad "took control."

{¶ 9} Girad picked up C.D.-H., threw her on a couch, pulled down his pants, pulled down her pants, and put his penis inside her vagina while pinning her down. The

4.

entire time, C.D.-H. was saying, "no, no, no, Assad, this is not what I want." After that, Girad dragged C.D.-H. to the floor, held her mouth and nose so she could not yell and could not breathe, and then ejaculated on her leg. DNA results confirmed that Girad's DNA was on C.D.-H.'s leg.

{¶ 10} When Girad finished, C.D.-H. said, "I don't want anything to do with you, you just raped me. And [Girad] said to her, I'm sorry, I didn't know what I was doing." C.D.-H. attempted to leave the lounge, but Girad would not let her go until he found his shoes and she showed him out of the building. Girad blocked C.D.-H.'s path to the door as he found his shoes, and while C.D.-H. was asking him to let her go. After he found his shoes, Girad demanded that C.D.-H. give him her phone. She did because she was scared. After he opened the phone, Girad deleted their match on the dating app, deleted their text messages, blocked his phone number, and deleted her recently blocked numbers. When C.D.-H. continued to ask him to let her go, he said, "no, you're going to get me out of here."

{¶ 11} The state believed that Girad's actions showed his consciousness of guilt because he attempted to cover his tracks by deleting all of his and C.D.-H.'s communications, asking her to get him out of the building, evading the detective who tried to speak to him about the case, lying to the police officers who arrested him, and running away from the police and resisting when officers tried to arrest him. The state also believed that Girad's actions were "calm, calculating, and meticulous," not confused

5.

or bizarre actions that might be related to a brain injury. It asked for maximum, consecutive sentences.

{¶ 12} Finally, when Girad addressed the court, he said goodbye to his family; claimed that he did not intentionally do any of his actions that night; said that he "can't necessarily describe how [his] brain—[his] head functions, . . ." he was mentally unstable, and his accident and brain injury changed his personality; "very sincere[ly]" "apologize[d] in the utmost"; disputed the state's claim that he was trying to get away because he was out on bond for a period of time and did not try to escape; took accountability for his actions and knew he was in the wrong; and felt that "the way things were described . . . were kind of a little bit just emphasizing certain parts of the story[,]" but he "kn[e]w [his] story doesn't matter . . . ."

{¶ 13} Girad did not think that he should get maximum sentences because C.D.-H. "didn't get harmed in any way" and "nothing entered her."

{¶ 14} After considering the principles and purposes of sentencing in R.C. 2929.11, the seriousness and recidivism factors in R.C. 2929.12, the victim impact statements, and the information in the PSI, the court found that the presumption for prison on the rape count was not overcome, community control sanctions would demean the seriousness of Girad's conduct and its impact on C.D.-H., a prison sentence was commensurate with his conduct and its impact on C.D.-H., a prison sentence would not place an unnecessary burden on state resources, and a prison sentence was necessary to protect the public from crime by Girad and others. The court sentenced Girad to nine

6.

years in prison for the rape conviction and 24 months in prison for the abduction conviction. The court ordered Girad to serve the sentences concurrently for an aggregate prison term of 9 to 13.5 years.

{¶ 15} Girad now appeals, raising one assignment of error:

THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE APPELLANT'S COUNTS ONE AND TWO AT SENTENCING[.]

## II. Law and Analysis

{¶ 16} In his assignment of error, Girad argues that his convictions for rape and abduction should have merged as allied offenses of similar import. He contends that his actions "did not involve separate victims, [] the harm was not separate and identifiable[,]" and "the acts that encompass both charges are indistinguishable." The state responds that Girad's convictions do not merge because they arose from different conduct and animus. It also contends that, even if the trial court erred by failing to merge the convictions, the error is harmless because the court sentenced Girad to concurrent sentences.

{¶ 17} Before addressing Girad's arguments, we find it necessary to address the state's contention that any trial court error is harmless because the court imposed concurrent sentences. "'[T]he imposition of concurrent sentences is *not* the equivalent of merging allied offenses.'" (Emphasis added.) *State v. Berry*, 2021-Ohio-2249, ¶ 26 (6th Dist.), quoting *State v. Damron*, 2011-Ohio-2268, ¶ 17. A trial court that imposes consecutive sentences rather than merging allied offenses commits plain error because such a sentence is contrary to law. *Id.*, citing *State v. Underwood*, 2010-Ohio-1, ¶ 31; *State v. Williams*, 2016-Ohio-7658, ¶ 28, *overruled in part on other grounds by State v.*

7.

*Henderson*, 2020-Ohio-4784. In other words, to put it simply, the state is wrong. If we find that Girad's convictions are allied offenses of similar import, we cannot also find that the trial court's error was harmless. *See Williams* at ¶ 28.

{¶ 18} Turning to Girad's assignment of error, R.C. 2941.25 prohibits multiple convictions for "allied offenses of similar import" arising from the same conduct. "[W]henever a court considers whether there are allied offenses that merge into a single conviction, the court 'must first take into account the conduct of the defendant. In other words, how were the offenses committed?'" *State v. Tellis*, 2020-Ohio-6982, ¶ 74 (6th Dist.), quoting *State v. Ruff*, 2015-Ohio-995, ¶ 25. To determine whether multiple convictions constitute allied offenses, the court must address three questions: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?" *Ruff* at ¶ 31. An affirmative answer to any of these questions permits separate convictions. *Tellis* at ¶ 74.

{¶ 19} We review de novo a trial court's ruling regarding whether convictions merge under the allied-offenses doctrine. *State v. Roberson*, 2018-Ohio-1955, ¶ 12 (6th Dist.). Girad did not raise the issue of allied offenses of similar import in the trial court. Therefore, our review of this issue is limited to plain error. *State v. Rogers*, 2015-Ohio-2459, ¶ 3. The defendant bears the burden of establishing that R.C. 2941.25 prohibits multiple punishments. *State v. Smith*, 2023-Ohio-866, ¶ 10 (6th Dist.), citing *State v. Washington*, 2013-Ohio-4982, ¶ 18. To meet his burden, Girad must "demonstrate a reasonable probability that the convictions are for allied offenses of similar import

8.

committed with the same conduct and without a separate animus[,]" and "absent that showing, the accused cannot demonstrate that the trial court's failure to inquire whether the convictions merge for purposes of sentencing was plain error." *Rogers* at ¶ 3. Although a legal question, whether R.C. 2941.25 has been properly applied "necessarily turns on an analysis of the facts[.]" *Smith* at ¶ 10, citing *State v. Bailey*, 2022-Ohio-4407, ¶ 11. The analysis "must focus on the defendant's conduct, rather than simply compar[ing] the elements of the two offenses." *Id.* at ¶ 9, citing *Ruff* at ¶ 30.

{¶ 20} Here, our analysis begins and ends with the second *Ruff* question, i.e., were the offenses committed separately? In the context of R.C. 2941.25(B), offenses are committed separately when one offense is completed before the other offense occurs, regardless of their proximity in time. *State v. Woodard*, 2022-Ohio-3081, ¶ 38 (2d Dist.), citing *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). "Therefore, 'when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts.'" *Id.*, quoting *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.).

{¶ 21} Girad was convicted of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." He was also convicted of abduction in violation of R.C. 2905.02(A)(2), which states that "[n]o person, without privilege to do so, shall knowingly . . . [b]y force or threat, restrain the liberty of

9.

another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

{¶ 22} The facts presented at Girad's sentencing hearing show that he committed the rape and abductions offenses entirely separately, albeit close in time. Girad committed—and completed—the rape offense by forcibly compelling C.D.-H. to submit to sexual conduct when he pulled down her pants and inserted his penis into her vagina. This happened before and apart from Girad committing the abduction offense by forcibly restraining C.D.-H.'s liberty under circumstances that placed her in fear when he would not let her leave the room after the rape until she helped him find his shoes and gave him her phone, which she did because she was scared. This is not a case in which the state is claiming that the abduction offense happened as *part of* the rape offense. *See, e.g., State v. Kretzer*, 2024-Ohio-2494, (6th Dist.). Instead, it is a case in which the two offenses were committed successively and separately. Because Girad committed his crimes separately, they are not allied offenses of similar import. *Woodard* at ¶ 44.

{¶ 23} Given that we have answered the second question of the *Ruff* analysis in the affirmative and determined that Girad's convictions are of dissimilar import because he committed them separately, we need not address the remaining two questions. *Tellis* at ¶ 81, citing *State v. Earley*, 2015-Ohio-4615, ¶ 12 (An affirmative answer "to any of the [required questions under *Ruff*] will permit separate convictions." (Emphasis deleted.)). Girad's sole assignment of error is not well-taken.

10.

### III. Conclusion

{¶ 24} Based on the foregoing, the December 3, 2024 judgment of the Wood County Court of Common Pleas is affirmed.  Girad is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.